[Crim. No. 3578. Fifth Dist. Jan. 31, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM CARL WILLIAMS, Defendant and Appellant.

COUNSEL

Craig H. Anderson, under appointment by the Court of Appeal, Simrin & Moloughney, Stanley Simrin, Quin Denvir, State Public Defender, Eric S. Multhaup and Richard S. Kessler, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler and Robert H. Philibosian, Chief Assistant Attorneys General, Arnold O. Overoye, Assistant Attorney General, Robert D. Marshall, Garrett Beaumont and Karen Ziskind, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BROWN (G. A.), P. J.—Appellant, William Carl Williams, was convicted of conspiring to commit first degree murder (Pen. Code, §§ 182, 187, 189) and was sentenced to life imprisonment. The jury failed to agree on a charge of attempted murder (Pen. Code, §§ 664, 187).

On this appeal appellant argues that there was insufficient corroborating evidence to support the accomplice's testimony, that there were errors in refusing to give and giving of instructions, and that the sentence of life imprisonment for conspiracy to commit first degree murder constitutes cruel and unusual punishment.

THE FACTS

On May 25, 1977, appellant was informed by his estranged wife that their daughter had been molested. She told him that Garlin Kelley was the person who had molested their daughter. After receiving this news appellant said he was going to kill Kelley. Appellant decided to build a remote control bomb and have Elva Matthews, his girl friend's brother, place the bomb in Kelley's truck. Matthews agreed to help appellant after appellant told Matthews to forget about certain money which was owed to appellant. The parties stipulated that appellant's daughter had been molested by Garlin Kelley.

On May 28, 1977, appellant and his girl friend, Cindy Duffle, went to the B & F Train Shop in Bakersfield. Appellant purchased a remote control device for the bomb. The remote control device was a "Futaba"

model No. FP-2CA. The next day appellant returned to the same shop and purchased a model boat with a Servo-Motor inside. Appellant removed the Servo-Motor for use in the construction of a bomb. He reportedly told Cindy that his son's birthday would provide a good cover story for these purchases.

Kent Partian, a friend of appellant's, testified that in May 1977 appellant telephoned him and asked if he could procure blasting caps or other explosives for him. Appellant said he wanted them for personal reasons and mentioned that his daughter had been molested. Appellant also went to visit Kent Partian to ask for blasting caps or explosives. Partian refused to give him any.

At appellant's request Cindy Duffle bought gunpowder at a local sporting goods store. She also filed a false burglary report stating that the items which had been purchased over the last few days had been stolen.

Appellant used the above items to build a bomb. He removed the tags on the items while doing so. After completing the bomb he showed it to Miss Duffle and to Mr. Matthews. He demonstrated how the bomb would work with the remote control device.

Between 11 p.m. on May 30 and the early morning hours of May 31 Elva Matthews, pursuant to appellant's instructions, placed the pipe bomb on the truck, set the bomb for detonation and installed a wire antenna so the remote control device could control and activate the bomb.

Appellant and Matthews met at J's Coffee Shop after the bomb had been placed on the truck. They then returned to appellant's house. Upon returning to appellant's house Cindy Duffle was picked up as were bags of luggage which she had packed in preparation to leave after the bomb was exploded. Appellant and his accomplices then returned to Garlin Kelley's apartment.

After one false start when appellant and his accomplices followed the wrong man, the police arrived at the scene. The plan had been discovered and the police came to search Kelley's truck for the bomb.

Upon seeing the police, appellant and Cindy Duffle fled, driving toward Santa Maria. Somewhere southwest of Bakersfield the remote

control device was thrown from the car. Apparently, appellant then decided to go back to Bakersfield. He told Miss Duffle not to say anything if contacted by the police.

The search of Garlin Kelley's truck revealed a pipe bomb and wire antenna. The bomb was described as being workable and lethal. A search of appellant's apartment, pursuant to a search warrant, turned up a remote control ship with its controls missing.

Appellant also told a next-door neighbor that he was not a mad bomber, but if he had attempted to kill Garlin Kelley he would have done so because Kelley molested his daughter. The comment to the next-door neighbor was made in response to a newspaper article which appeared in the Bakersfield Californian.

## DISCUSSION

■ Cindy Duffle and Elva Matthews testified for the prosecution under grants of immunity. Appellant argues that their testimony was not sufficiently corroborated by other evidence tending to connect him with the commission of the crime. (See Pen. Code, § 1111.)

In determining whether sufficient corroborating evidence has been produced the test is: "The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged." (*People* v. *Lyons* (1958) 50 Cal.2d 245, 257 [324 P.2d 556].)

■ Applying the test to the facts here, the corroborating testimony was superabundant. It included appellant's testimony that he wanted to kill Kelley when he learned that Kelley had molested his daughter. Kent Partian testified that appellant asked for blasting caps and other explosives. Partian also testified that appellant mentioned his daughter had recently been molested and he needed the explosives for personal reasons. Appellant and Cindy Duffle purchased at separate times a re-

mote control device and a motor to be operated by the device. A remote control bomb was found in Garlin Kelley's truck. Appellant left town shortly after the bomb was discovered. The bomb which was found in Garlin Kelley's truck contained parts identical to those which appellant had purchased. A short time after the incident appellant told a next door neighbor that had he committed the crime it would be justified because Garlin Kelley had molested his daughter.

■ Appellant next contends that the court erred in refusing to give a special instruction on corroboration offered by him.

The court gave standard CALJIC No. 3.12.[1] The special instructions requested provided: "Evidence is sufficient to corroborate an accomplice's testimony only if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth."

"There is insufficient corroboration if it requires aid from the testimony of the witness to be corroborated in order to connect the defendant to the crime."

"In determining whether or not such remaining evidence connects the defendant to the offense charged, you are instructed that evidence that merely shows an association with the actual criminals, or that only casts grave suspicions on the defendant, is not sufficient corroborating evidence."

Appellant does not maintain that CALJIC No. 3.12 was in error; only that his special instruction was better. Indeed CALJIC No. 3.12

---

[1]The court instructed: "Corroborative evidence is evidence of some act or fact related to the offense which, if believed, by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the offense charged.

"However, it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged, or that it corroborate every fact to which the accomplice testifies.

"In determining whether an accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the offense.

"If there is not such independent evidence which tends to connect defendant with the commission of the offense, the testimony of the accomplice is not corroborated.

"If there is such independent evidence which you believe, then the testimony of the accomplice is corroborated."

has been approved for use in cases involving accomplice testimony and corroborative evidence. (See, for example, *People* v. *Jenkins* (1973) 34 Cal.App.3d 893, 898-899 [110 Cal.Rptr. 465].) Even assuming appellant's instruction was better, there is no requirement that the jury be instructed in the precise language requested by a party. (*People* v. *Jenkins, supra*, 34 Cal.App.3d at p. 899.)

■ Next appellant complains that the court erred in giving a flight instruction (see CALJIC No. 2.52). The argument is meritless. The trial court had a duty to give the instruction because there was abundant evidence of flight tending to show guilt. (Pen. Code, § 1127c; *People* v. *Cannady* (1972) 8 Cal.3d 379, 391 [105 Cal.Rptr. 129, 503 P.2d 585].) Both Cindy Duffle and Elva Matthews testified as to appellant's flight upon discovery of the bomb by the police, the bags having been packed beforehand in preparation for leaving.

The last contention is that a sentence of life imprisonment for the crime of conspiracy to commit first degree murder constitutes cruel and unusual punishment. While the issue poses some difficulty, we have concluded that under the standards adopted by our Supreme Court the penalty is not "so disproportionate to the crime...that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921]; fn. omitted.)

■ Preliminarily, respondent argues that the challenge to the constitutionality of the penalty is premature in that appellant must wait until the Community Release Board has set his actual term pursuant to Penal Code sections 3040-3046, relying upon *People* v. *Wingo* (1975) 14 Cal.3d 169, 183 [121 Cal.Rptr. 97, 534 P.2d 1001], and *People* v. *Romo* (1975) 14 Cal.3d 189, 193 [121 Cal.Rptr. 111, 534 P.2d 1015]. The argument lacks merit. Those cases dealt with indeterminate terms in which the exact terms were to be set by the Adult Authority (now Community Release Board). Here the Community Release Board has no authority to fix the term of years for a prisoner sentenced to life imprisonment. The sentence is a determinate sentence of life imprisonment and the punishment is both the minimum and maximum. The constitutionality of the sentence must be judged by the life sentence. The probability that he will have an earlier parole date fixed is irrelevant to the issue. (See *In re Foss* (1974) 10 Cal.3d 910, 919 [112 Cal.Rptr. 649, 519 P.2d 1073].)

■ Adverting to the central issue, the Supreme Court in *In re Lynch, supra*, 8 Cal.3d 410, has held that a prison sentence may constitute cruel or unusual punishment "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Id.*, at p. 424; fn. omitted.)

■ To aid the administration of the rule, *Lynch* suggested three methods of analysis: (1) examine the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society (*In re Lynch, supra*, 8 Cal.3d at p. 425); (2) compare the challenged penalty with punishments prescribed in the same jurisdiction for different offenses, deemed by the above test to be more serious (*id.*, at p. 426); and (3) compare the challenged penalty with punishments prescribed for the same offense in sister jurisdictions (*id.*, at p. 427).

The court has warned that these tests are not to be mechanically applied but serve only as guides. (*People* v. *Wingo, supra*, 14 Cal.3d 169.)

■ Another general principle has a direct bearing upon this question. As stated in *Lynch*, at page 414: "We recognize that in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments, and that such questions are in the first instance for the judgment of the Legislature alone. [Citations.]" (8 Cal.3d at p. 414.) *Lynch* further instructs that: "'"mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears."'" (*In re Lynch, supra*, 8 Cal.3d at pp. 414-415; see also *People* v. *Wingo, supra*, 14 Cal.3d 169, 174.) It is also appropriate to note that in approaching this subject we must bear in mind that: "Whether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment." (*In re Lynch, supra*, 8 Cal.3d at pp. 423-424.)

Turning to the suggested techniques for analysis, we first examine the nature of the offense and the offender with particular regard to the degree of danger both present to society.

■ In California conspiracy is a separate and distinct offense from the crime committed. (See Pen. Code, § 182; *Williams v. Superior Court* (1973) 30 Cal.App.3d 8, 12 [106 Cal.Rptr. 89].) ■ "[T]he basic conspiracy principle has some place in modern criminal law, because to unite, back of a criminal purpose, the strength, opportunities and resources of many is obviously more dangerous and more difficult to police than the efforts of a lone wrongdoer." (*Krulewitch v. United States* (1949) 336 U.S. 440, 448-449 [93 L.Ed. 790, 797, 69 S.Ct. 716] (conc. opn. of Jackson, J.).) Collaboration magnifies the risk to society both by increasing the likelihood that a given quantum of harm will be successfully produced and by increasing the amount of harm that can be inflicted. As the United States Supreme Court wrote in *Callanan v. United States* (1961) 364 U.S. 587, 593-594 [5 L.Ed.2d 312, 317, 81 S.Ct. 321]: "Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise." (Fn. omitted.) (See *Williams v. Superior Court, supra,* 30 Cal.App.3d 8, 12; *People v. Koch* (1970) 4 Cal.App.3d 270, 276 [84 Cal.Rptr. 629].)

Thus wrongful conduct by such combination should be criminally punished even when the same acts would be excused or receive a lesser punishment when performed by an individual; group criminal conduct calls for enhanced punishment, and society has a justifiable right and obligation to intervene at an earlier stage.

■ First degree murder is probably viewed by society as the most heinous crime of which mankind is capable. In the instant case the offense involved a well-conceived plan to accomplish that most heinous crime, and overt acts in the preparation and execution of the plan pro-

ceeded to a point perilously near completion. If it had not been for the fortuitous intervention of the police during the last moments the murder would have been accomplished. The underlying offense, if it had been accomplished, would clearly have been first degree murder. (Pen. Code, § 189.)

While appellant was justifiably outraged at the intended victim for molesting his (appellant's) daughter, that rage does not justify entering into a conspiracy to kill Kelley with a planted homemade pipe bomb a week after the incident. His mental state in committing this crime was found to be, and must be, equated with that which is the most culpable in our society—the mental state needed to be found guilty of first degree murder. The jury was fully instructed on both degrees of murder and voluntary manslaughter. Verdicts of conspiracy to commit manslaughter or second degree murder were rejected. Furthermore, at the time of trial appellant continued to believe in taking the law into his own hands in cases such as this.

Thus, the nature of the offense in the abstract and under the facts of this particular case compel the conclusion that the offense and the offender constitute a serious and grave danger to society. We therefore conclude that given the nature of the offense and the offender, the imposition of life imprisonment is justified.

The second prong of the *Lynch* method of analysis directs a comparison between the punishment imposed for this crime with the punishment imposed for other crimes in this state which are deemed more serious under the above test.

The problem is to determine what crimes, if any, should, and may, be "deemed more serious" and more dangerous to society than conspiracy to commit first degree murder. Appellant has selected a list of offenses which he deems more serious because they involve harm to some victim or "potential for harm at least equal to that which existed in the present case."

Examples of the crimes listed by appellant are: Penal Code section 151, subdivision (a)(2), advocating the willful killing or injuring of a police officer if death ensues; 16 months, 2 or 3 years (Pen. Code, § 18). Penal Code sections 187 and 189, second degree murder; 15 years to life (Pen. Code, § 190). Penal Code section 216, administering poison with intent to kill but death does not ensue; two-four-six years.

Penal Code section 217, assault with intent to kill; two-four-six years. Penal Code section 347, poisoning food, drink, medicine, spring or reservoir with intent that the same shall be taken by a human; two-three-four years. Penal Code section 12308, exploding or attempting to explode a destructible device with intent to kill; five-seven-nine years.

The approach taken by appellant overlooks the nature of the crime of conspiracy, as compared with actions of a single individual, and focuses far too much on the actual physical harm that may occur. We believe, however, that in order to meaningfully compare this offense with others we must, additionally, compare the mental culpability of the actor in any crime with which this offense is to be compared (see *People* v. *Wingo, supra*, 14 Cal.3d at p. 178) and bear in mind the nature of the crime of conspiracy (as heretofore explained). Applying the criteria we have just explained, it appears to us that the only offense more serious than conspiracy to commit first degree murder is first degree murder itself.[2] The current prescribed punishments for first degree murder are death, life without possibility of parole, or 25 years to life. (Pen. Code, § 190.)

The last technique is to compare the punishment imposed in this state to the punishment imposed for the same crime in other states. Of the 51 states and the federal government, three (the federal government, Arkansas and Utah) provide for discretionary punishment up to life imprisonment for conspiracy to commit first degree murder. Of the balance, 19 prescribe maximums of 10 years, 3 maximums of 14 to 15 years, and 16 maximums of 20 years.

In this regard it is important to recall the teachings of *Wingo* that a disparity in penalty for the same crime between this and other states is

---

[2]It is interesting to note that certain crimes without the mental state of first degree murder carry sentences of life imprisonment. For example, kidnaping for ransom where no bodily harm is inflicted carries a penalty of life imprisonment; and if the kidnaped person does suffer bodily harm or death the penalty is life imprisonment without possibility of parole. (Pen. Code, § 209, subd. (a).) Train wrecking where a person is killed carries a penalty of death or life imprisonment without possibility of parole; if no one is killed the penalty is life with possibility of parole. (Pen. Code, § 219.) Finally, second degree murder now has a penalty of 15 years to life. (Pen. Code, § 190.) Further, while it is by no means controlling, it is interesting to note that the punishment of five years to life, and a three-year minimum sentence before parole eligibility has been upheld for the offense of selling heroin when attacked on cruel and unusual punishment grounds. (*People* v. *Serna* (1975) 44 Cal.App.3d 717, 721 [118 Cal.Rptr. 904].)

only some indication that California's penalty is excessive. *Wingo* warns that this and the other *Lynch* tests are not to be applied with mechanical exactitude, nor is California concerned with conforming our Penal Code to the "majority rule" or the least common denominator of penalties nationwide. Our codes "have served as a model for the nation rather than a mere mirror of the laws of other jurisdictions,..." (*People v. Wingo, supra*, 14 Cal.3d at p. 179.)

As indicated, three jurisdictions permit imposition of life imprisonment for the subject crime. To the extent there is a disparity between the balance of the states and California's chosen punishment, rendering the challenged penalty to some extent suspect, we do not believe that the disparity is so shocking as to require us to strike down our Legislature's determination. Moreover, assuming the punishment is suspect under this third criteria, it must nevertheless be upheld in view of the conclusions we have reached applying the first two techniques of *Lynch*. (*People v. Madden* (1979) 98 Cal.App.3d 249, 260 [159 Cal.Rptr. 381]; *Bosco v. Justice Court* (1978) 77 Cal.App.3d 179, 189 [143 Cal.Rptr. 468].)

In sum, we do not believe the punishment imposed here is constitutionally suspect under either the first or second techniques of analysis. While it may be somewhat suspect in view of the third method of analysis, no one "test" is conclusive or dispositive. Accordingly, after applying the three tests outlined by *Lynch*, we conclude that the penalty of life imprisonment for the crime of conspiracy to commit first degree murder does not constitute cruel and unusual punishment.

The judgment is affirmed.

Franson, J., and Zenovich, J., concurred.

On February 29, 1980, the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied April 10, 1980.