[No. D003512. Fourth Dist., Div. One. Nov. 25, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS GAETANO PHILLIP LUPARELLO et al.,
Defendants and Appellants.

412

**COUNSEL**

Thomas Gaetano Phillip Luparello, in pro. per., Michael Ian Garey, Ann Shaw and Scott R. Jakust, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Keith I. Motley, M. Howard Wayne and Jesus Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KREMER, P. J.**—Thomas Gaetano Phillip Luparello and Carlos Orduna appeal respective judgments convicting them of conspiracy to commit an assault by means of force likely to produce great bodily injury (Pen. Code,[1] §§ 182, subd. 1, 245) and murder (§ 187) and finding a firearm allegation to be true (§ 12022, subd. (a)). Orduna was also found to have intentionally killed the victim while lying in wait. (§ 190.2, subd. (a)(15).) On appeal, Luparello contends the prosecutor's conduct was improper, he was ineffectively assisted at trial, hearsay evidence was improperly admitted, the jury was misinstructed, complicity theories cannot support his charged criminal liability, and his convictions are not supported by the evidence and resulted in cruel or unusual punishment. Orduna similarly alleges prosecutor misconduct, instructional error, improper application of complicity doctrine, insufficiency of the evidence, and cruel or unusual punishment. Additionally, he contends his motion to sever was improperly denied and the jury was biased. For the reasons set out below, we reject both defendants' contentions and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Luparello practiced chiropractics and Terri Cesak was his patient. Luparello eventually hired Terri as a receptionist, and soon they began an affair. Under pressure from Luparello's wife, Terri left her job in May 1980. Terri then met and shortly thereafter married Ed Gadzinski.

Luparello did not see Terri again until early 1981. At that time, both were having marital problems; Luparello was involved in the dissolution of his marriage. In early February, Terri apparently separated from her husband and returned to her job with Luparello. Her employment lasted for several weeks until Ed induced Terri to return home. She voluntarily stayed until the end of March, when she returned to work and moved into Luparello's house. Luparello then had three other roommates: Brad Wilson, Ben Wilson and Ron Jennings.

On May 8, 1981, Luparello went to San Francisco to confer with counsel about his divorce. Later that same day, Terri moved her belongings from Luparello's house and reconciled with her husband. After storing their possessions in several locations, Terri and Ed established a new residence in a different county. At this time, Terri was pregnant with Luparello's child.

Luparello called home on May 9 and a roommate told him Terri had left. Luparello returned immediately and began an intensive search for Terri. He

---

[1] All statutory references are to the Penal Code unless otherwise specified.

contacted the police, personal friends, and relatives of both Terri and Ed, and requested a patient to go to Ed's workplace and follow him home. On the evening of May 11, Luparello met with Orduna, who was also Luparello's patient, and Johnny Salmon at his house. He stated he wanted Orduna and Salmon to help find Terri. Luparello, Orduna and Salmon were joined by Ben Wilson, Luparello's roommate, and the four drove to Orduna's house. On the way, Luparello and Salmon discussed the cost for Orduna's and Salmon's services. Ben saw Luparello give Salmon $40, and Luparello later told Ben the total cost would be $200.

Luparello also personally continued to search for Terri. He hoped to elicit information from Mark Martin, a good friend of Terri's husband and best man at Terri and Ed's wedding. At about 8 p.m. on May 13, Luparello, Brad Wilson, Orduna, Salmon and a person identified as "Spooky" gathered at Luparello's house. In talking to Luparello and Orduna, Salmon stated they were going to "thump" the person from whom they wanted information. Orduna agreed with Salmon. Luparello remarked he would like the information at any cost. At this time, Orduna was carrying a sword and Salmon had nunchakus. Salmon also loaded a .22 caliber rifle belonging to Luparello. Thereafter Luparello, Orduna, Salmon and "Spooky" left the house, taking the weapons, though not the rifle, with them. After 35 minutes the group returned, picked up Brad Wilson, and drove to Mark Martin's house. Orduna, Salmon and Brad Wilson got out of the car and approached Martin's house. Orduna and Salmon were carrying their respective weapons. Orduna and Salmon instructed Brad to lure Mark Martin from his house and they would beat him. Brad, however, refused to do so. When Martin came to the door, Brad asked only if he knew Terri's whereabouts. Orduna and Salmon, who were waiting in the shadows at the sides of the house, later chided Brad for not getting Martin to leave his house.

On the next evening, May 14, 1981, Brad Wilson returned home to find Orduna and Salmon inside. They were again armed with a sword and nunchakus, respectively. Luparello was present, but was making a telephone call at the time. After 15 or 20 minutes, Orduna and Salmon left. Approximately two hours later, Orduna knocked on the door of Mark Martin's house. When Martin, who owned an automotive machine shop, came to the door, Orduna asked whether he would look at Orduna's car which was parked in the street. After Martin stepped out of his house, Orduna quickly backed away. Someone in or near the parked car, the engine of which was running, fired six shots at Martin and he fell to the porch and died. Orduna ran to the car, and he and his companion drove off.

Luparello and Orduna were charged with conspiracy to commit an assault by means of force likely to produce great bodily injury (§§ 182, subd. 1,

245) and murder (§ 187) and were alleged to have intentionally killed Martin while lying in wait (§ 190.2, subd. (a)(15)) and to have been armed with a rifle during the commission of the above offenses (§ 12022, subd. (a)). After a joint trial, the jury found Luparello and Orduna guilty on both counts and the allegations the defendants were armed to be true. The special circumstance allegation was found true as to Orduna, but not Luparello.

After losing a new trial motion, Luparello was sentenced to 25-years-to-life imprisonment for first degree murder and received an additional year for being armed with a rifle. His three-year conspiracy sentence, however, was stayed. In the penalty phase of the proceedings, the jury determined Orduna should suffer life imprisonment without possibility of parole. In turn, Orduna moved under section 1385 to dismiss the special circumstance finding. After considering a number of factors and determining the interests of justice did not warrant such a harsh penalty, the trial court granted the dismissal and sentenced Orduna to 25-years-to-life imprisonment for first degree murder and enhanced the sentence by one year because Orduna had been armed. His conspiracy sentence was similarly stayed.

## LUPARELLO'S APPEAL

## I

## PROSECUTORIAL MISCONDUCT

 A prosecutor is not merely an advocate for the People. "His duty is not to obtain convictions, but to fully and fairly present to the court the evidence material to the charge upon which the defendant stands trial, . . ." (*In re Ferguson* (1971) 5 Cal.3d 525, 531 [96 Cal.Rptr. 594, 487 P.2d 1234].) In performing this duty, he or she is not limited to Chesterfieldian politeness or restraint and may vigorously argue the case. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 580 [189 Cal.Rptr. 855, 659 P.2d 1144].) Fervor, without more, does not implicate an impropriety. Prejudicial misconduct arises when the prosecutor uses "deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*People* v. *Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672].) Here, Luparello alleges four distinct instances of such conduct. He concedes each instance "in isolation might not be considered 'grossly improper', [but] such misconduct, considered in aggregate, denied Appellant a fair trial and compels reversal of the judgment of conviction." We begin by reviewing each allegation and then determining their cumulative effect, if any.

### A. *Improper References to Street Gang Membership*

In setting out the conspiracy allegations, the original information stated Luparello knew Orduna to be a member of the "F-Troop" gang, an ethnic

street gang based in Orange County. ██ Although all gang references were deleted from the amended information, the prosecutor sought, at trial, to admit evidence Orduna belonged to F-Troop and Luparello knew this and previously recruited him to assist in a neighborhood dispute. In an *in limine* hearing, the trial court questioned the relevance of this evidence but did not bar absolutely its admission. Instead, the trial court directed the prosecutor to alert the court to the impending introduction of this evidence and the court would rule on its admissibility at that time. Luparello argues the prosecutor disregarded this directive and cites several examples which, he alleges, prejudiced him.

Of the four examples proffered by Luparello, two involve no suggestion of gang membership but instead concern the prosecutor's attempt to inform the jury regarding Orduna's prior assistance in Luparello's dispute with some neighbors. The first of these occurred during Brad Wilson's direct examination. After the court sustained several defense objections and admonished the jury the particular line of testimony was admissible only to Luparello, the prosecutor continued: ". . . What was the substance of the conversation?

"A. That at a previous time—I'm unsure when—

"[Luparello's Counsel]: Same objection.

"The Court: The objection is sustained as to the defendant Orduna. [¶] You may proceed.

"Q. . . . What was the substance of the conversation, where Dr. Luparello was indicating to you what Dr. Luparello's previous relationship with Mr. Orduna was?

"A. He said that early in the year he had trouble with his neighbors across the street and that he had—I don't know what to say, the exact words—used them or got their help in settling the dispute.

"Q. Referring to Mr. Orduna?

"A. Yes.

"[Luparello's Counsel]: Object. Move to strike. Irrelevant. And the previous grounds. [¶] It also appears to be speculation as to, as to who's involved and what it is.

"The Court: The testimony will be stricken as to the defendant Orduna. The objection is sustained."

Later, during the testimony of Ben Wilson, the prosecutor elicited similar testimony: "Q. Didn't he say to you, didn't Dr. Luparello say to you that he felt Carlos and Johnny could take care of this problem at this time?

"A. Yes, Sir, he did.

". . . . . . . . . . . . . . . . . . . . . . .

"Q. . . . yes. Didn't Dr. Luparello also tell you they had taken care of other problems and they were sure they could take care of this one, also?

"A. Yes." Luparello immediately objected, asserting this query had violated the trial court's directive regarding evidence of Orduna's past acts. The trial court agreed but determined any wrongdoing could be remedied by permitting the neighbor involved in the alleged dispute to be called as a defense witness. Luparello's counsel agreed this would resolve potential problems and the neighbor was called and testified favorably for Luparello.

We agree with the trial judge and Luparello's trial counsel that any prejudice flowing from the prosecutor's questions was greatly minimized by the neighbor's testimony, which completely eliminated any suggestions of wrongdoing by Orduna in connection with the neighborhood dispute. Reversal on this basis is not required. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

■ On two other occasions, however, the prosecutor ignored the trial court's earlier admonition and attempted to put before the jury evidence Orduna belonged to a street gang which was routinely involved in violent and threatening activities. In the first instance, the prosecutor questioned Martin's neighbor who witnessed the shooting and asked whether he had been threatened sometime before testifying. The neighbor responded someone had written "FXTX Vida" on his van. In response to Luparello's motion to strike, the prosecutor, out of the presence of the jury, interpreted the graffito as meaning "F Troop, Live or Die." The trial court admitted the evidence, but admonished the jury to consider the evidence only in regard to the witness's credibility. (See *People* v. *Lybrand* (1981) 115 Cal.App.3d 1 [171 Cal.Rptr. 157].)

This admission of marginally relevant evidence was later turned on its head when the prosecutor sought to take advantage of its inflammatory effect in his cross-examination of Police Officer Daniel McCoy who had been called as a defense witness for the purpose of testifying regarding statements made by Michael Martin, the victim's brother, shortly after the shooting. Michael Martin was the person who had answered Orduna's knock on May

14 and had called his brother to the door. Michael described the person he saw to Officer McCoy as "Mexican," "five three to five five," "kind of stocky," and wearing a black or dark blue beanie "like the F-Troopers and Delhi guys wear."

Perceiving that an opportunity had been thrust into his hands to get before the jury suggestive and prejudicial information which he had otherwise been prevented from introducing, the prosecutor cross-examined Officer McCoy as follows: "[Prosecutor]: You heard a reference in the tape—it's on page 3 and it's in the middle of the page on page 3—to F-Troopers. And the question was, 'You talking about the beanie, the navy type beanie, the cloth beanie that goes over the head?'

"And then Mike's answer was, 'Like the F-Troopers and Delhi guys wear, yeah.'

"Is that right?

"A. Yes, Sir.

"Q. What type of experience have you had with this 'F' Troop gang?

"A. I spent five years—

"[Luparello's Counsel]: I have to object to the relevance of saying 'this "F" Troop gang.'

"The Court: Sustained.

"[Luparello's Counsel]: I have no objection if the officer corroborates that that's what a lot of them wear. But the way the question was phrased—

"The Court: The objection's been sustained.

"[Prosecutor]: I'll rephrase the question then, Your Honor.

"Q. What experience do you have with 'F' Troop, as a Santa Ana police officer?

"A. I was assigned to the street gang detail for five years and during that time conducted many investigations involving 'F' Troop.

"Q. What type of gang is 'F' Troop?

"A. It's a street gang.

"Q. Where are they located?

"[Luparello's Counsel]: I have to object again. It's not relevant to this case.

"[Prosecutor]: It certainly is, Your Honor.

"The Court: The objection is sustained.

"Q. Well, have you become aware of the type of hats that 'F' Troop gang members where [sic]?

"A. Well, their clothing, what they have worn, yes, sir.

"Q. What type of clothing does this 'F' Troop gang where [sic]?

"A. I've seen them wearing the beanies.

"Q. What other type of clothing do they wear?

"A. (No response.)

"Q. Like pants, do they wear khaki type pants?

"A. Yes, Sir.

"Q. Have you seen them wearing just plain t-shirts?

"A. Yes, Sir.

"Q. Do they wear any particular type of shoes?

"A. No, not a particular type but a variety.

"Q. Over what period of time have you had occasion to come in contact with 'F' Troop gang members in the City of Santa Ana?

"A. Over a five-year period.

"Q. And had you been investigating crimes that have been committed by these gang members?

"A. Yes, Sir.

"Q. And you've been assigned to the crimes against persons detail at the Santa Ana police department; is that right?

"A. Yes, Sir.

"Q. That involves homicides and attacks against people?

"A. Yes, Sir.

"Q. Prior to that you were assigned to a gang detail specifically involving the apprehension of gang type warfare in Santa Ana?

"A. Yes, Sir.

"Q. Was it during this period of time that you became aware of this 'F' Troop gang?

"A. Yes, Sir.

"Q. Does the 'F' Troop gang—

"[Luparello's Counsel]: I object. I move to strike the entire thing about 'F' Troop.

"[Prosecutor]: Your Honor, he brought it out.

"[Luparello's Counsel]: There's absolutely no relevance. The witness merely stated that the type of beanie was consistent with, in his opinion, 'F' Troop or the Delhi guys and from that a line of irrelevant questions is being asked. Object. Move to strike what's in so far.

"The Court: Well, the objection to this question, the court will rule on it when counsel finishes the statement. Or the question.

"[Prosecutor]: Fine. Thank you, Your Honor.

"Q. . . . Does F-X-T-X signify the 'F' Troop gang?

"A. Yes, Sir.

"The Court: Then the objection to that question will be sustained. The answer is stricken.

"I take it you still had your objection?

"[Luparello's Counsel]: Yes."

In this manner, the prosecutor used a relatively innocuous description of a type of head gear worn by the man who knocked at Martin's door and began a foray based consistently on leading questions in which he attempted to inform the jury by innuendo not only that F-Troop was a street gang whose members were suspected of committing homicides and other violent attacks on persons, but also that the gang was likely connected to the case in such a way that its members had threatened a material witness.

The People seek to justify the prosecutor's conduct on the theory that defense counsel "opened the door" by introducing Michael Martin's taped statement which included the "F-Troop" reference. The fact that a topic is raised on direct examination and may therefore appropriately be tested on cross-examination, however, does not amount to a license to introduce irrelevant and prejudicial evidence merely because it can be tied to a phrase uttered on direct examination. Here, the prosecutor's attempt to cast Orduna as a member of a violent gang was irrelevant for any purpose other than to suggest Orduna's predisposition to commit violent acts, a purpose specifically prohibited by Evidence Code section 1101, subdivision (a). (*People v. Perez* (1981) 114 Cal.App.3d 470, 477 [170 Cal.Rptr. 619]; see also *In re Wing Y.* (1977) 67 Cal.App.3d 69, 79 [136 Cal.Rptr. 390].)

While the court's sustaining of defense objections and striking of testimony suggested it did not condone such conduct, the flagrancy of the prosecutor's misconduct makes it highly unlikely that even a conscientious jury could completely ignore what it had heard. (See *People v. Taylor* (1961) 197 Cal.App.2d 372, 382 [17 Cal.Rptr. 233]; see also *People v. Kirkes* (1952) 39 Cal.2d 719, 726 [249 P.2d 1].) On the other hand, we must recognize that the prejudicial effect of inadmissible gang membership evidence lies in its tendency to suggest that a defendant is the type of person predisposed to commit violent acts of the type engaged in by the gang to which he belongs. (See *People v. Cardenas* (1982) 31 Cal.3d 897, 905 [184 Cal.Rptr. 165, 647 P.2d 569] (plur. opn.); *People v. Perez, supra,* 114 Cal.App.3d at p. 477.) Here, the evidence surrounding the planning and preparation for the assault on Mark Martin adequately demonstrated Orduna's willingness to use weapons and engage in acts of violence. (See *ante,* p. 419.) In this context, evidence connecting Orduna to a violent street gang—although hardly desirable from Orduna's or Luparello's point of view—did not have the impact it might otherwise have had. Moreover, while the prosecutor's misconduct firmly implanted in the jurors' minds that F-Troop was a violent gang, the evidence of Orduna's membership in the gang

was tangential. In an attempt to minimize the effect of the prosecutor's misconduct, the court was careful to instruct the jurors ". . . that there [was] no credible evidence in this case that Carlos Orduna was a member of any criminally oriented gang."

California appellate courts have repeatedly recognized that even flagrant misconduct by a prosecutor does not relieve them of their obligation to ascertain whether the misconduct resulted in a miscarriage of justice within the meaning of article VI, section 13, of the California Constitution. (See, e.g., *People* v. *Hamilton* (1963) 60 Cal.2d 105, 120-121 [32 Cal.Rptr. 4, 383 P.2d 412]; *People* v. *Wirth* (1960) 186 Cal.App.2d 68, 78 [8 Cal.Rptr. 823].) Under the circumstances of this case, we do not believe that the gang membership evidence which was improperly placed before the jury makes it reasonably probable that the jury would have reached a different verdict in the absence of the misconduct. (See *People* v. *Munoz* (1984) 157 Cal.App.3d 999, 1013 [204 Cal.Rptr. 271].)

B. *Bad Faith Inquiry*

Ben Wilson testified on direct examination by the prosecutor that Luparello told him he paid $200 for the assistance of Orduna and Johnny Salmon. The prosecutor was apparently aware that informers who had been incarcerated with Salmon stated he told them he was paid $800 up front and was to receive $10,000 for beating Mark Martin and another $15,000 as a bonus for killing him. During a break in Ben Wilson's testimony, the respective counsels discussed in camera the possibility of admitting the informers' statements, and the trial court indicated its preliminary view that such evidence was inadmissible, the final decision to be reached at a later hearing.[2]

Thereafter the prosecutor resumed his questioning of Ben Wilson as follows: "Q. Now, do you recall Dr. Luparello ever telling you that he had paid Johnny Salmon $800 up front?

"A. No, Sir, I do not.

"Q. And that he was to get a total of $10,000—." Luparello's counsel objected, challenging the leading nature of the question and the prosecutor's good faith in asking it. The court agreed with defense counsel and, after a

---

[2]The court later ruled admission of the informers' statements would violate the defendants' confrontation clause rights established in *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] and *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]. (See also *People* v. *Leach* (1975) 15 Cal.3d 419 [124 Cal.Rptr. 752, 541 P.2d 296]; *People* v. *Coble* (1976) 65 Cal.App.3d 187 [135 Cal.Rptr. 199].)

voir dire examination of Wilson in chambers, prohibited the prosecutor from continuing his line of questioning. The court and defense counsel then agreed to forego any admonition to the jury on the theory it would merely draw attention to the point.

We are troubled by the prosecutor's attempt to use his questioning to get before the jury information he could not legitimately introduce directly through the testimony of the informers. (See *People* v. *Perez* (1962) 58 Cal.2d 229 [23 Cal.Rptr. 569, 373 P.2d 617]; *People* v. *Blackington* (1985) 167 Cal.App.3d 1216 [213 Cal.Rptr. 800].) We cannot conclude, however, that such conduct requires reversal. The suggestion contained in the prosecutor's question merely disagreed in amount with facts already admitted by Wilson. The jury was properly instructed pursuant to CALJIC No. 1.02 that questions asked by counsel are not evidence and are not to be considered as such. In no sense can it be considered reasonably probable that a different result would have been reached in the absence of the misconduct. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

### C. *Misconduct During Closing Argument*

██ Luparello asserts the prosecutor unacceptably and inflammatorily compared him to Charles Manson and unconstitutionally commented on Luparello's failure to testify. ██ In reference to the first allegation, we note the prosecutor may broadly argue the facts and law of a case but may not prejudicially misrepresent the character of the accused nor intentionally appeal to the fears and emotions of the jury. (*People* v. *Fosselman, supra,* 33 Cal.3d at pp. 580-581; *People* v. *Jones* (1970) 7 Cal.App.3d 358, 362-363 [86 Cal.Rptr. 516].) In discussing the instruction on aiding and abetting, the prosecutor stated: "So this is one who aids and abets. One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are committing, but he's also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged.

"If one person sets in motion some people that are out of control and they go in and start killing people—

"An example might be, and we talked about it, is the Charles Manson case type of thing. Charles Manson is a classic example of the aider and abettor. He apparently wasn't present at any of the crime scenes. Yet he set in motion some people that were just out of control. And they killed and maimed at will. Yet Charles Manson was responsible for those particular crimes.

"And he's responsible under theories such as this one here where even though the person didn't intend that a particular crime be committed, that person is liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged.

"So if you send some—I hate to use the word 'crazy' because it's got different meanings in the criminal law. But if you send some people that are completely out of control to go do something, and it's reasonable and probable that they will get carried away and execute someone, then you're guilty, just as guilty as they are, of that execution."

Luparello did not properly preserve his challenge to this argument by objection below. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) �In any event, the prosecutor's comments were neither erroneous nor prejudicial. His reference to Charles Manson provided a proper, albeit provocative, example of the workings of an aider and abettor theory. The comments neither expressly or impliedly parallel Luparello's character to that of Charles Manson. Mere reference is not an impassioned plea aimed at the jury's fears and anxieties.

█ Luparello further asserts the prosecutor's following argument violates the rule of *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], which prohibits comment on the defendant's exercise of his constitutional right not to testify: "Now with respect to Mr. Chatterton [Luparello's counsel], a number of places here Mr. Chatterton has indicated to us that—at one time Mr. Chatterton indicated that Dr. Luparello wouldn't have wanted to tell Brad that, referring to something, I don't know what he's referring to offhand. One time Mr. Chatterton indicated that, either in argument or in the opening statement, that Dr. Luparello lied to the police because of Kelly Schwulst's statement to him.

"Another time Dr. Luparello asked Brad to go to the door at the Martin house because Brad wouldn't be involved in that, in a beating, says [*sic*]. That's why Dr. Luparello asked Brad to go to the door. Remember that?

"Another time—what do you think Dr. Luparello believed with respect to whether Brad would lie or not?

"All of those questions and statements suffer from the same problem. There is no evidence in this case whatsoever as to what Dr. Luparello was thinking about why Dr. Luparello asked Brad to do this, what Dr. Luparello heard from anyone other than what we heard in the case. What Dr. Luparello thought because Kelly called him. No evidence of that. Any evidence of

what was going on in Dr. Luparello's mind with respect to that is just rank speculation.

"We talked about this early on. Everything that is an inference from the facts has to be established by the facts. What are the facts? This is an important issue in this case. Why did Dr. Luparello lie so much to the police? Mr. Chatterton's answer is because of what Kelly Schwulst had told him. Does that wash in your mind?

"One, there is no evidence whatsoever that that was what caused Luparello to lie to the police. That's just speculation by Mr. Chatterton. The only thing that we have in that respect is that Kelly did tell him that. So apply that in your experience."

While it is undisputed "*Griffin* prohibits reference to a defendant's failure to take the stand in his own defense, that rule does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence . . . ." (*People* v. *Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213]; accord *People* v. *Vargas* (1973) 9 Cal.3d 470, 475 [108 Cal.Rptr. 15, 509 P.2d 959].) Here, the prosecutor neither comments directly on Luparello's failure to testify nor indirectly encourages the jury to speculate about his silence. He instead properly reviews critical aspects of the defense theory relative to Luparello's mental state and points out the dearth of evidence to support the theory. Luparello's testimony was not necessarily the only material evidence on this point. That he did not testify and did not choose to proffer other relevant evidence does not preclude the prosecutor from illuminating this deficiency. The prosecutor's comments are not *Griffin* error.

### D. *Delay of Trial*

On October 6, 1981, all parties stipulated the trial would recess during the trial judge's previously scheduled vacation and would reconvene on November 4, 1981. However, on November 4, the prosecutor could not proceed in the instant case because he had become unexpectedly involved with another murder trial. The prosecutor requested the instant trial be continued until November 23, 1981. After a hearing, the trial court granted the request. Luparello now argues this "delay" denied him a speedy trial and is another ground for misconduct. We find no merit in this contention.

Luparello cites *People* v. *Hannon* (1977) 19 Cal.3d 588 [138 Cal.Rptr. 885, 564 P.2d 1203], for the proposition the "constitutional right to a speedy trial may be violated by prejudicial delay resulting from intentional efforts to harass or oppress a defendant or simply the neglect of the state or its

officers." (*Id.* at p. 609.) However, *Hannon* dealt exclusively with *pretrial* delay and has no relevance to the instant case. Indeed, even assuming the cited language did apply, Luparello's assertion would still fail. He has not shown, nor does the record reveal, the prosecutor intentionally or negligently delayed the instant proceedings. As was determined at the trial court's hearing on this matter, the delay resulting from the prosecutor's conflicting commitments was unavoidably unforeseeable.

In reviewing Luparello's allegations of misconduct, individually and collectively, while we find error, we find no significant prejudice to him.

## II

### INEFFECTIVE ASSISTANCE OF COUNSEL

█ The charge of inadequate assistance at trial is a serious one, and the appellant has the burden of proving his claim. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859].) "[I]n cases in which a claim of ineffective assistance of counsel is based on acts or omissions not amounting to withdrawal of a defense, a defendant may prove such ineffectiveness if he establishes that his counsel failed to perform with reasonable competence and that it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings. [Citations.]" (*People* v. *Fosselman, supra,* 33 Cal.3d at p. 584.) Further, "[r]eviewing courts will reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively discloses counsel had no rational tactical purpose for his act or omission." (*Id.* at p. 581.) Luparello grounds his complaint in his counsel's failure to oppose the People's motion to dismiss and his later failure to seek dismissal when his rights to a speedy trial were denied.

█ Early in the trial, the trial court was asked to determine the admissibility of a hearsay statement by Luparello. The court initially excluded the statement (although it later reversed its ruling and allowed admission). Believing the case against Luparello was jeopardized by the initial exclusion of the hearsay statement, the People sought to dismiss the information against Luparello. Luparello's counsel challenged this dismissal, and it is this act which Luparello now faults. Initially, we note the record clearly shows Luparello *personally* endorsed his counsel's action. Moreover, counsel's argument on this motion evidences numerous tactical decisions for his opposition. Counsel was aware jeopardy had not attached and the People would refile against Luparello. A new trial would not present the same obstacles to the admission of the challenged hearsay statement, and the increased investigation time afforded by a dismissal would likely strengthen

the People's case which counsel viewed as "weak" at that time. In sum, Luparello can not be heard to complain for a tactical action which he personally endorsed.

Luparello also contends his counsel should have sought dismissal when the trial was not commenced in accord with section 1382, subdivision 2. This section mandates dismissal when trial in a superior court is not commenced within 60 days after the information is filed. In the present case the information was filed on July 24, 1981, and trial was commenced on September 16, 1981. Given the elapsed time between these dates, Luparello's assertion must be seen as a result of a miscalculation. The 60th day of the statutory period was September 21, 1981. On these facts, Luparello's assertion must fail.

Finally, Luparello faults his counsel for failing to seek dismissal when the trial could not be reconvened on November 4. As discussed above, this delay did not infringe upon Luparello's right to a speedy trial, and there was no evidence of misconduct in the prosecutor's seeking of the continuance. Most importantly, the record shows Luparello's counsel again chose to proceed for tactical reasons. In discussing the court's ruling on a hearsay statement, Luparello's attorney stated: "I took the tactical position that I wasn't going to make a big stink about it; that the relationship that had been established up to that point in time had me winning on this issue when opposed to Mr. Brown [the prosecutor], and with Mr. Brown's position that he wasn't going to relitigate—and I recognize that was really in reference to going to another court—but it still led me to believe that with Mr. Brown and I in front of this court on that issue, I was going to win that issue.

"So rather than insist that we proceed to trial immediately or that we even oppose the trailing condition, we didn't do that. And I think that had we made a stink this court would have felt compelled to direct the district attorney to have somebody ready to try this case at a sooner time. But we continued to trail this matter until November the 23rd.

"I advised my client, during that period of time, to be patient, though he wanted to get this thing to trial. He doesn't like sitting in jail; that tactically it was better for us to have Bryan Brown on the case rather than to have some new attorney who might be more inventive, who might be willing to raise the argument to relitigate those evidentiary motions instead of Mr. Brown."

In reviewing all of Luparello's allegations, we find he has failed his burden of showing he was ineffectively assisted by counsel.

## III

### ADMISSION OF LUPARELLO'S HEARSAY STATEMENT

On the day of the homicide, Luparello telephoned Mrs. Hazel Schwulst, the mother-in-law of Mark Martin's very good friend, and stated: "[I have] some Mexicans that are going to take care of Mark Martin." After an extensive hearing, the trial court reversed an earlier ruling and admitted the hearsay statement. Luparello now argues that ruling was improper under the rule of *People* v. *Aranda, supra,* 63 Cal.2d 518.

In *Aranda* the California Supreme Court held a defendant's extrajudicial statement which implicated a codefendant could not be admitted unless the trial court undertook one of several safeguards. (*People* v. *Aranda, supra,* 63 Cal.2d at pp. 529-531.) Here, however, Luparello is the *declarant* of the statement and in this capacity, the protections of *Aranda* do not apply. If this problem does arise it is Orduna, the arguably implicated nondeclarant, who is entitled to *Aranda* protections (and this he so argues). As to Luparello, the statement constitutes a party admission and is excepted from the hearsay bar by Evidence Code section 1220 which provides: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ." Thus, the admission of the hearsay statement against Luparello was proper.

## IV

### INSTRUCTIONAL ERROR

The prosecution alleged two overt acts to support the conspiracy to commit an assault charge against Luparello. Luparello argues each act, in itself, was sufficient to support the charge, and since the trial court failed to instruct[3] the jury to agree unanimously on one specific act, his conspiracy conviction should now be reversed.

While it is clear a trial court does have a duty to instruct sua sponte on general principles of law relevant to issues raised by the evidence (*People*

---

[3]Luparello argues CALJIC Nos. 4.71.5 and 17.01, if given, would have remedied the alleged error. No. 4.71.5 provides: "And, in order to find the defendant guilty, you must unanimously agree upon the commission of the same specific act [or acts] constituting said crime within the period alleged. [¶] It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

CALJIC No. 17.01 similarly provides: "He may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty, all the jurors must agree that he committed the same act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311]), the duty Luparello seeks to impose does not arise from the present facts. Indeed, case law holds the jury charge here was quite adequate. (*People v. Skelton* (1980) 109 Cal.App.3d 691, 715-717 [167 Cal.Rptr. 636].)

The court instructed that Luparello's meeting with Orduna and several other unnamed parties on May 13 to solicit their assistance in finding Ed and Terri Gadzinski constituted the first overt act and the second was the shooting of Mark Martin on May 14 (pursuant to the above conspiracy). Luparello argues that by coupling each overt act with other evidence two *separate* conspiracies are revealed, one occurring on May 13 and the other on May 14. Consequently, further instruction on whether one or two conspiracies were formed was required. He also argues that without greater explication, the instructions run afoul of the rule in *People* v. *Diedrich* (1982) 31 Cal.3d 263, 280-281 [182 Cal.Rptr. 354, 643 P.2d 971], which requires the jury to agree unanimously on a single, specific act as the basis for a particular conviction.

Luparello's hypothesis is unfounded. The evidence shows Luparello wanted to find Terri "at any cost," he solicited assistance from Orduna and Salmon, he paid $40 and promised more, he went to Mark Martin's house with Orduna and Salmon who carried deadly weapons, and he failed in his first attempt. Undaunted, Luparello called Hazel Schwulst the next day, again seeking information regarding Terri's whereabouts and stating he had some Mexicans who would take care of Martin. Several hours later Orduna, under pretense, led the victim to his death. The evidence thus shows a *continuous* conspiratorial effort that was simply thwarted in its first attempt to reach its goal. The evidence does not reveal two distinct conspiracies, as Luparello argues, but a number of distinct acts arising from "one overall agreement" and forming a continuous course of conspiratorial conduct. (See *People* v. *Skelton, supra,* 109 Cal.App.3d at p. 718.)

In any event, the special instructions requested by Luparello are not warranted in the present case. In *People* v. *Skelton, supra,* 109 Cal.App:3d 691, this court, faced precisely with the issue now raised by Luparello, determined a special instruction requiring jury unanimity on an overt act furthering a conspiracy need not be given when a jury is instructed in the language of CALJIC Nos. 6.10 and 17.50. CALJIC No. 6.10 defines conspiracy and provides: "In order to find a defendant guilty of conspiracy, in addition to proof of the unlawful agreement and specific intent, there must be proof of the commission of at least one of the overt acts alleged in the information. . . ." CALJIC No. 17.50 is a concluding instruction which in part provides: "In order to reach a verdict all 12 jurors must agree to the decision and to any finding you have been instructed to include in your

verdict." After reviewing the instructions in *Skelton,* we concluded: "These most specific instructions [No. 6.10] must be viewed in conjunction with the unqualified requirements that proof be made beyond a reasonable doubt as to each element of an offense and that the verdict be unanimous. There is no inadequacy in the instruction given. . . ." (*Id.* at p. 717.) Here as in *Skelton,* CALJIC Nos. 6.10 and 17.50 were given. And again as in *Skelton,* we find instruction on conspiracy to be proper and complete.[4] Thus, given the proffered instructions here, the trial court had no duty to provide further instruction sua sponte. (See *People* v. *Mota* (1981) 115 Cal.App.3d 227, 232-233 [171 Cal.Rptr. 212].)

V

CRIMINAL LIABILITY PREDICATED ON CONSPIRACY AND AIDING AND ABETTING THEORIES

The trial court charged the jury with several different theories by which Luparello's guilt for first degree murder could be affixed; among these were conspiracy and aiding and abetting. On appeal, Luparello faults the application of the complicity theories in two ways. First, he maintains conspiratorial liability, as charged to the jury, violates the principle of *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580].

In *Ireland,* the Supreme Court held felony-murder instruction was improper "when it is based upon a felony [in that case assault with a deadly weapon] which is an integral part of the homicide . . . ." (*Id.* at p. 539.) In reaching its result, the high court reasoned: "To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law. . . ." (*Ibid.*)

Luparello concedes a felony-murder instruction was not given in the present case and the precise *Ireland* holding consequently does not apply. He asserts, however, the conspiracy instruction given here, that is, CALJIC No. 6.11, is the functional equivalent of the felony-murder instruction in *Ireland* and similarly allows improper "bootstrapping." We disagree.

---

[4]The California Supreme Court in the recent case of *People* v. *Croy* (1985) 41 Cal.3d 1 [221 Cal.Rptr. 592, 710 P.2d 392], noted a jury is not required to make a special finding as to which of several alleged acts constituted the specific overt act underlying a conspiracy conviction. (*Id.* at p. 17.)

Luparello specifically points to the language of CALJIC No. 6.11[5] which provides: "Every conspirator is legally responsible for an act of a coconspirator that follows as one of the probable and natural consequences of the object of the conspiracy even though it was not intended as part of the original plan . . . ." From this he reasons the jury, so instructed, could have found him guilty of first degree murder without any proof of malice notwithstanding he did not commit the homicide nor intend its commission. This, he concludes, replicates the error in *Ireland*.

While the *Ireland* court did fault the second degree murder finding there absent some consideration of malice, it did so because of the illogic of applying the felony-murder rule to those circumstances. The same failing does not apply here. ▮▮▮ The felony-murder rule's purpose is to deter felons from killing negligently or accidentally. (*People* v. *Satchell* (1971) 6 Cal.3d 28, 34 [98 Cal.Rptr. 33, 489 P.2d 1361]; *People* v. *Washington* (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130]; *People* v. *Summers* (1983) 147 Cal.App.3d 180, 188 [195 Cal.Rptr. 21] (conc. opn. of Wiener, J.).) Theoretically, this end is achieved by holding would-be felons strictly responsible for all killings they commit during the perpetration, or attempted perpetration, of any statutorily enumerated felony. (*People* v. *Washington, supra,* 62 Cal.2d at p. 781.) While arguably accepting the rule's purpose, our courts have nevertheless consistently stated felony murder is a "highly artificial concept" which "deserves no extension beyond its required application." (*People* v. *Phillips* (1966) 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353]; accord *People* v. *Dillon* (1983) 34 Cal.3d 441, 463 [194 Cal.Rptr. 390, 668 P.2d 697].) The rule is seen as "unnecessary" in almost all cases in which it was applied and, indeed, has been viewed as ending "the relation between criminal liability and moral culpability." (*People* v. *Washington, supra,* at p. 783.) Thus, for example, where the underlying felonious conduct is not independent of an assault which results in death, that is, where it merges with the homicide, our courts have consistently ruled the killing was outside the felony-murder rule. (See, e.g., *People* v. *Smith* (1984) 35 Cal.3d 798 [201 Cal.Rptr. 311, 678 P.2d 886]; *People* v. *Sears* (1970) 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847]; *People* v. *Wilson* (1969) 1 Cal.3d 431 [82 Cal.Rptr. 494, 462 P.2d 22].) In

---

[5] As modified in this case, CALJIC No. 6.11 in its entirety provides: "Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if said act or said declaration is in furtherance of the object of the conspiracy.

"The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators. Every conspirator is legally responsible for an act of a coconspirator that follows as one of the probable and natural consequences of the object of the conspiracy even though it was not intended as a part of the original plan and even though he was not present at the time of the commission of such act; this instruction does not apply to the special circumstance allegation in this case."

California, then, the felony-murder doctrine is judicially disfavored and restrictedly applied.

In contrast, the policy supporting conspiratorial liability receives neither the disfavor nor restriction which adhere to the felony-murder rule. That a conspirator is criminally liable for acts done in furtherance and as a reasonable consequence of a conspiracy is so well settled and accepted in California jurisprudence, citation to that proposition is burdensome rather than illuminating. An early and oft-cited statement of conspiratorial liability is found in *People* v. *Kauffman* (1907) 152 Cal. 331 [92 P. 861]: "'The general rule is well settled that where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine. In contemplation of law the act of one is the act of all. Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan. Nevertheless the act must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection between them may be reasonably apparent, and not a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design. Even if the common design is unlawful, and if one member of the party departs from the original design as agreed upon by all of the members, and does an act which was not only not contemplated by those who entered into the common purpose, but was not in furtherance thereof, and not the natural or legitimate consequence of anything connected therewith, the person guilty of such act, if it was itself unlawful, would alone be responsible therefor.'" (*Id.* at p. 334.) The law, thus stated, implicitly recognizes the greater threat of criminal agency and explicitly seeks to deter criminal combination by recognizing the act of one as the act of all. As recognized in *People* v. *Welch* (1928) 89 Cal.App. 18 [264 P. 324]: "Unquestionably, the purpose of the law in making it an offense to conspire to commit a crime is to reach everyone who in any way participated in forming the evil plan irrespective of who or how many carry out the design, and well may this be a protection to society, for a group of evil minds planning and giving support to the commission of crime is more likely to be a menace to society than where one individual alone sets out to violate the law." (*Id.* at p. 22.) Thus, coconspirators, bound in criminal combination, are mutually bound to a punishment dictated by their conspiratorial efforts. Viewed in this light, the bridge between punishment and moral culpability, so illusory or, upon scrutiny, evanescent under the felony-murder rule, stands here on much firmer ground. So too, deterrence, while absent when the underlying felony merges under the felony-murder doctrine, is clearly present under

the accepted theory of conspiratorial liability. ▮▮▮ In combining to plan a crime, each conspirator risks liability for conspiracy as well as the substantive offense; in "planning poorly," each risks additional liability for the unanticipated, yet reasonably foreseeable consequences of the conspiratorial acts, liability which is avoidable by disavowing or abandoning the conspiracy. ▮▮▮ Moreover, our criminal code recognizes and, indeed, reinforces conspiracy's independent threat by identifying it as a separate and distinct crime which never merges with the resulting substantive offense.[6] (§ 182; *People* v. *Williams* (1980) 101 Cal.App.3d 711, 721 [161 Cal.Rptr. 830].) In sum, the logical and legal impediments to criminal liability found in *Ireland* and its progeny have little or no dissuasive value here in limiting conspiratorial liability for the natural and reasonable consequences of a conspiracy. This being so, we find no obstacle in applying the well-accepted rule of liability to hold Luparello criminally responsible for Martin's murder.[7]

Luparello next attacks the theoretical underpinnings of conspiratorial and aiding-and-abetting liability, and specifically argues the murder here was the unplanned and unintended act of a coconspirator and therefore not chargeable to Luparello under either complicity theory.[8]

▮▮▮ Luparello first faults both theories for "imposing" the mens rea of the perpetrator upon him. As Luparello views it, both theories work to presume conclusively the accomplice shares the perpetrator's intent and thereby runs afoul of *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61

---

[6]"Unlike the case of a fatal blow struck with malice in which the battery is merged in the murder because it is an integral part of the homicide itself, a conspiracy, in most jurisdictions, is a distinct offense quite apart from the contemplated crime. Because of this fact the notion that a conspiracy is merged in the resulting offense is unsound and has been quite generally rejected in this country . . . ." (Perkins & Boyce, Criminal Law (3d ed. 1982) pp. 687-688, fns. omitted.)

[7]In this context Luparello also contends the asserted error is exacerbated by misinstruction on implied malice. He specifically contends CALJIC No. 8.11 "did not inform the jury that it must find that the defendant must harbor an actual appreciation of the risk involved—i.e., a risk of death." We find Luparello misreads this instruction. As given here, CALJIC No. 8.11 provides: "Malice is implied when the killing results from an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and *with a wanton disregard for human life by which is meant an awareness of a duty imposed by law not to commit such acts followed by the commission of the forbidden act despite that awareness.*" (Italics added.) The level of subjective awareness required for an implied malice finding are adequately explicated by the instructional language we have italicized. (*People* v. *Poddar* (1974) 10 Cal.3d 750, 755-756 [111 Cal.Rptr. 910, 518 P.2d 342]; *People* v. *Summers, supra,* 147 Cal.App.3d at p. 184.)

[8]For the purpose of this discussion, we will treat conspiracy and aiding and abetting as subspecies of the same general theory of complicity. We are mindful not all commentators would agree with such a categorization (see, Note, *Development in the Law—Criminal Conspiracy* (1959) 72 Harv.L.Rev. 920, 998-999), but find this usage acceptable for the limited inquiry on which we embark.

L.Ed.2d 39, 99 S.Ct. 2450]. In *Sandstrom,* the trial court instructed the jury that the law presumed a person intends the ordinary consequences of his voluntary acts. The Supreme Court reasoned the jurors, so instructed, ". . . could reasonably have concluded that they were directed to find against the defendant on the element of intent. The State was thus not forced to prove 'beyond a reasonable doubt . . . every fact necessary to constitute the crime . . . charged,' . . . ." (*Id.* at p. 523 [61 L.Ed.2d at pp. 50-51].) The instruction was thus held constitutionally defective and violative of the defendant's due process rights. (*Id.* at pp. 522-523 [61 L.Ed.2d at p. 50].) Here, however, neither the conspiracy nor the aiding and abetting instructions recite the flawed presumption found in *Sandstrom,* nor do they present some equivalent of that presumption. Indeed, Luparello errs when he concludes the perpetrator and accomplice must "share" an identical intent to be found criminally responsible for the same crime. Technically, only the perpetrator can (and must) manifest the mens rea of the crime committed. Accomplice liability is premised on a different or, more appropriately, an equivalent mens rea. (Kadish, *Complicity, Cause and Blame: A Study in the Interpretation of Doctrine* (1985) 73 Cal.L.Rev. 323, 349, fn. 51 [hereafter cited as *Complicity Doctrine*].) This equivalence is found in *intentionally* encouraging or assisting or influencing the nefarious act. "[B]y intentionally acting to further the criminal actions of another, the [accomplice] voluntarily identifies himself with the principal party. The intention to further the acts of another, which creates liability under criminal law, may be understood as equivalent to manifesting consent to liability under the civil law." (*Complicity Doctrine, supra,* at pp. 354-355; see generally Robinson, *Imputed Criminal Liability* (1984) 93 Yale L.J. 609.) Thus, to be a principal to a crime, the conspirator need only intend to agree or conspire and to commit the offense which is the object of the conspiracy (*People* v. *Horn* (1974) 12 Cal.3d 290, 296 [115 Cal.Rptr. 516, 524 P.2d 1300]); while the aider and abettor must intend to commit the offense or to encourage or facilitate its commission (*People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318]). Liability is extended to reach the actual, rather than the planned or "intended" crime, committed on the policy conspirators and aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put in motion. And it is precisely this policy which Luparello next challenges.

As previously discussed, Luparello maintains neither complicity theory can, in logic, predicate a murder charge against him on the unintended act of a coconspirator and, as applied in this case, are therefore theoretically infirm. Professor Sandford Kadish recently examined this argument in his thoughtful and provocative article, *Complicity, Cause and Blame: A Study in the Interpretation of Doctrine* (*Complicity Doctrine, supra,* 73 Cal.L.Rev. 323). In Professor Kadish's schema, two distinct doctrines coexist to affix

criminal responsibility: causation and complicity. Causation links blame to the actor for those physical events which, once put in motion, relentlessly collide with one another, eventually resulting in demonstrable harm. Complicity doctrine, on the other hand, affixes liability derivatively, charging a secondary party, that is, a coconspirator or an aider and abettor, with the criminal act of the principal whom the secondary party has intentionally and knowingly influenced or assisted. Thus, acts done in furtherance of a conspiracy or assisted or facilitated by an aider and abettor present no obstacles to affixing liability under the respective complicity theories. So understood, complicity doctrine works to attach liability *only* when the secondary actor has *intended* his influence or assistance. (*Id.* at pp. 346-348.) The unintended consequence is beyond the scope of this theory. Nor, as Professor Kadish opines, can causation doctrine reach a principal's unintended acts to attach liability to the accomplice who neither intended nor anticipated the ultimate criminal act. As Professor Kadish explains: "We regard a person's acts as the products of his choice, not as an inevitable, natural result of a chain of events. Therefore, antecedent events do not cause a person to act in the same way that they cause things to happen, and neither do the antecedent acts of others. To treat the acts of others as causing a person's actions (in the physical sense of cause) would be inconsistent with the premise on which we hold a person responsible." (*Id.* at p. 333.) Thus, the uncaused nature of a principal's volitional act impairs, if not precludes, a causative explanation for accomplice liability for the natural, probable and reasonable, though unintended, consequences of the conspiracy or the aided and abetted crime. (*Id.* at pp. 398-403.)

While we do not dispute the metaphysics of Professor Kadish's conclusion, we question whether, in a real world sense, the choices of an *intentionally* influenced conspirator or aided and abetted principal are so wholly volitional the prime mover should escape moral blame and criminal culpability.[9] Indeed, in circumstances like the well-orchestrated, assisted and funded criminal plot undertaken by Luparello, we think not. As one commentator explained: "[T]he concept of agency explains a great deal about why we feel justified in punishing an accomplice as if she were the perpetrator. Perhaps, however, our feelings may be described better in terms of 'forfeited personal identity.' Ordinarily a person is held criminally responsible for his

---

[9]After recognizing causal responsibility has been extended in tort to reach an actor's conduct which is not wholly volitional, Professor Kadish suggested "the problem of the reach of criminal law is hardly different depending on the volitionality of the primary actor's conduct." (*Complicity Doctrine, supra,* 73 Cal.L.Rev. at p. 404, fn. omitted.) To this, he footnoted an apt example: "Consider the case of a police guard who negligently leaves his gun in the open ward of a mental hospital. If an incompetent person uses the gun to kill, the criminal law permits the guard to be held for manslaughter on a causation theory. There is no greater peril to ordinary behavior if the guard is also made liable when a competent visitor uses the gun to kill." (*Id.* at p. 404, fn. 260.)

own actions. However, when an accomplice chooses to become a part of the criminal activity of another, she says in essence, 'your acts are my acts,' and forfeits her personal identity. We euphemistically may impute the actions of the perpetrator to the accomplice by 'agency' doctrine; in reality, we demand that she who chooses to aid in a crime forfeits her right to be treated as an individual. Thus, moral distinctions between parties are rendered irrelevant. We pretend the accomplice is no more than an incorporeal shadow." (Dressler, *Reassessing the Theoretical Underpinnings of Accomplice Liability: New Solutions to an Old Problem* (1985) 37 Hastings L.J. 91, 111, fn. omitted.) Professor Kadish himself noted: "It is apparent that the grip of the conception that a voluntary human action bars assigning causal responsibility to an earlier actor, pervasive as it is in the law, is loosened by the pull of the policy holding people liable for recklessly providing others with an occasion to do harm. . . ." (*Complicity Doctrine, supra,* 73 Cal.L.Rev. at p. 402.) ▆▆▆ The California Supreme Court implicitly recognized this "pull of policy" in the recent case of *People* v. *Croy, supra,* 41 Cal.3d 1: "The requirement that the jury determine the intent with which a person tried as an aider and abettor has acted is not designed to ensure that his conduct constitutes the offense with which he is charged. His liability is vicarious. Like the conspirator whose liability is predicated on acts other than and short of those constituting the elements of the charged offense, if the acts are undertaken with the intent that the actual perpetrator's purpose be facilitated thereby, he is a principal and liable for the commission of the offense. Also like a conspirator, he is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets. . . . [¶] It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. *His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator.* It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which *Beeman* holds must be found by the jury. . . ." (*Id.* at p. 12, fn. 5, citations omitted, italics added.)

Adopting the reasoning of the Supreme Court, we find the conspiracy and aiding and abetting theories proffered here do not suffer the theoretical infirmities of which Luparello complains. In the circumstances of this case, each provides a sound basis to derive Luparello's criminal responsibility for first degree murder.

Luparello relies upon *People* v. *Garewal* (1985) 173 Cal.App.3d 285 [218 Cal.Rptr. 690], and *People* v. *Henderson* (1985) 163 Cal.App.3d 1001 [209

Cal.Rptr. 883], to dissuade us from this conclusion. Neither, however, does so. In *Garewal,* the trial court modified the standard conspiracy instruction, CALJIC No. 6.11, to extend conspirator responsibility to the probable and natural consequence of the conspiracy "'. . . even though it was not intended as a part of the original plan, *or was even actually forbidden as part of the original agreement . . . .*'" (*People* v. *Garewal, supra,* at p. 299.) After reviewing both the principles and the criticisms of derivative responsibility in the conspiracy and aiding and abetting contexts, the court determined the modified instruction erroneously and unjustifiably extended conspirator liability. Concluding its updated analysis, the appellate court returned to historical roots: "[W]e conclude the clear thrust of *Beeman* is to contain the reach of vicarious criminal responsibility of conspirators to the natural and reasonable consequences of the conspiracy." (*Id.* at p. 302.) Though we have taken a different path, we concur with the conclusion of Division Three of this court. Finally, *Henderson* does not even reach the question of derivative liability for, under an erroneous aiding and abetting instruction, it could not be determined whether the defendant in that case acted with a specific intent to commit or facilitate the commission of the charged crime.

## VI

### SUFFICIENCY OF THE EVIDENCE

Luparello contends the evidence is insufficient to support (1) his criminal liability on either conspiracy or aiding and abetting theories and (2) his conviction for first degree murder. In support of his second contention, Luparello argues there is no evidence he premeditated or deliberated the killing of the victim. Luparello's liability, however, is affixed as a principal under both conspiracy and aiding and abetting theories. Luparello concedes Orduna, his coconspirator and aided and abetted colleague, was convicted of first-degree murder for killing while lying in wait (§ 189). Also, as is discussed below, sufficient evidence supports Orduna's conviction for premeditated and deliberate murder. Proof of Luparello's own premeditation and deliberation is therefore unnecessary if the evidence supports his derivative criminal liability for Orduna's acts. We thus review the evidence supporting the conspiracy and aiding and abetting theories.

As previously discussed, a conspirator is criminally liable for the act of a coconspirator which follows as a probable and natural consequence of the common design, even though it was not intended as a part of the original design or common plan. (*People* v. *Kauffman, supra,* 152 Cal. at p. 334; *People* v. *Martin* (1983) 150 Cal.App.3d 148, 164 [197 Cal.Rptr. 655]; *In re Darrell T.* (1979) 90 Cal.App.3d 325, 334 [153 Cal.Rptr. 261].)

"The question of what constitutes a natural and probable consequence is one of fact for the jury." (*People* v. *Martin, supra,* at p. 164.) Here the object of the conspiracy was to garner information regarding the whereabouts of Terri and Ed Gadzinski by any means necessary, including assault.[10] Luparello specifically targeted Mark Martin for he believed Martin had contacted Ed Gadzinski or, at least, knew where he was residing. He solicited Orduna and Salmon's assistance in extracting information, forcefully if necessary, from Martin and paid them for their efforts. Luparello accompanied them on an abortive trip to confront Martin. He was aware Orduna and Salmon carried deadly weapons with them at that time. Luparello had also told them he wanted the information "at any cost." The following day Luparello told Hazel Schwulst he had some Mexicans who were going to take care of Mark Martin, and he met with Orduna and Salmon several hours before the shooting. He was again aware they were carrying deadly weapons. That a homicide resulted from a planned interrogation undertaken "at any cost" by armed men confronting an unwilling source is unquestionably the natural and probable consequence of that plan. The evidence thus supports Luparello's liability for the conspiratorial acts.

Luparello insists killing the victim was inconsistent with the conspiratorial goal of obtaining information regarding Terri's whereabouts and therefore could not be a natural and probable consequence of the conspiracy. While this reasoning is appealing, Luparello's overall conduct belies the conclusion he reaches. Luparello's effort to gain information was concerted, and the enlisting of Orduna and Salmon to interrogate and "thump" a would-be informer was not the only avenue of inquiry he pursued. Indeed, he contacted the police and relentlessly pursued Ed and Terri's friends and relatives for information. When his efforts went unrewarded and his frustrations mounted, Luparello's threats and intimidations became more pointed. His statement regarding Mexicans who were going to take care of the would-be victim is such an example. In this context, Martin's eventual killing may be seen as yet one more escalation of Luparello's desire to gain information "at any cost." While Martin obviously provided no information here, his death was a warning to those who had not yet assisted Luparello that they should. While, in retrospect, Martin's death may be seen as an unproductive means to learn of Terri's whereabouts, it is not inconsistent with that goal.

In examining the sufficiency of the evidence in the present case, we are guided by the appellate court's resolution of this same issue in *People* v. *King* (1938) 30 Cal.App.2d 185 [85 P.2d 928]. There, on strikingly similar

---

[10]As we discuss at section IX, *post,* it is the conspiratorial pursuit of an otherwise lawful object by unlawful means that makes the combination a crime. (*People* v. *Fujita* (1974) 43 Cal.App.3d 454, 471 [117 Cal.Rptr. 757].)

facts, the Court of Appeal determined an unplanned murder was the natural and probable consequence of a planned assault. As the court explained: "In the present case there is presented no question of death resulting from the commission of a simple assault . . . . There is here a death resulting from the use of a deadly weapon which the appellants say they never intended. Such weapon was, however, actually used, and by one who joined with them in the plan to beat up the deceased, which plan they counseled. The question is whether the use of such a deadly weapon upon the [victim] and his resulting death was a natural or probable consequence of the plan or agreement among the actual assailants and the appellants for which the appellants may be held liable, two of them, . . . not being present.

"The character of the plan is of great importance. Here, several men set out to beat up another. In the words of [the defendant], he 'sent them over to tamp the chief'. Preparations were made for trouble. It was known that he was vigorous and strong. One, at least, prior to setting out on the expedition, equipped himself with a bludgeon. At the scene of the expected trouble others were asked to stand by. Not being able to get at the victim the first day, the majority returned the second day and proceeded to the victim's place of abode aboard ship. They prepared, and were prepared, to meet force with force and to overcome resistance at any cost. The natural and probable consequence of such an undertaking is homicide, and the homicide here committed by one of the conspirators is nothing less than murder. All who combined to commit the unlawful act of violence are equally guilty. The law makes no distinction between them and each is responsible for the act of any other of the party in the prosecution of the original design. All joining in the enterprise are as guilty of murder as the person who actually caused the death. [Citations.]" (*Id.* at pp. 200-201.)

Luparello relies on *People* v. *Werner* (1940) 16 Cal.2d 216 [105 P.2d 927], to argue for a contrary conclusion. His reliance, however, is misplaced. In *Werner* two of three coconspirators entered a "secret agreement" for the precise purpose of concealing their conduct from the other member of the conspiracy. That member was nonetheless charged with the criminal consequence of the secret agreement. In reversing the uninvolved coconspirator's conviction, the Supreme Court held coconspirator liability would not attach when the act in question was ". . . the fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design. . . ." (*Id.* at p. 223.) As the above review of the evidence shows, the killing here was a foreseeable, though as to Luparello a possibly unintended, consequence of the conspiracy. It was not, however, a fresh and independent act of a coconspirator and consequently cannot absolve Luparello from his shared criminal responsibility.

Luparello also challenges the finding of criminal liability under an aiding and abetting theory.[11] Luparello does not deny he aided and abetted Orduna and Salmon, but instead rejects culpability because he had no knowledge the perpetrator(s) intended to kill the victim. This, however, is not the law. ▮ "[T]he aider and abettor in a proper case is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged. . . ." (*People* v. *Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198], italics omitted, citing *People* v. *Villa* (1957) 156 Cal.App.2d 128, 134 [318 P.2d 828].) ▮ Applying the above recited facts to this theory, we again find factual support for Luparello's criminal liability: he aided and abetted Orduna and Salmon in the planned confrontation of Mark Martin and the consequential assault naturally and reasonably resulted in Martin's death.

Luparello argues *People* v. *Smith* (Cal.App.) and *People* v. *Butts* (1965) 236 Cal.App.2d 817 [46 Cal.Rptr. 362], parallel the present facts and compel a finding favorable to him. However, the California Supreme Court granted hearing on *Smith* on January 27, 1983, vacating the opinion and later transferring the cause for further consideration. (*People* v. *Smith* (D004490) hg. granted Jan. 27, 1983 (Crim. 22953) cause trans. to Ct.App. Apr. 24, 1986, for reconsideration in light of *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] and *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826].) This case cannot, therefore, provide the analytical parallels Luparello proposes. In *Butts,* the Court of Appeal found the alleged aider and abettor had no knowledge of the principal's wrongful purpose. Here, the evidence shows Luparello had knowledge of Orduna and Salmon's planned assault of Mark Martin, but does not clearly reveal his knowledge of the eventual murder. However, this knowledge, in contrast to Luparello's contention, is not necessary. As an aider and abettor, Luparello is responsible for the natural and probable consequences of the acts which he intentionally encourages.

In sum, substantial evidence supports the application of conspiracy and aiding and abetting theories. Luparello's first-degree murder conviction, predicated on the principals' conduct, is thus also substantially supported.[12]

---

[11]The aiding and abetting instruction given in the present case was modified in accordance with *People* v. *Tewksbury* (1976) 15 Cal.3d 953 [127 Cal.Rptr. 135, 544 P.2d 1335], to require proof of a shared criminal intent. Luparello does not challenge the adequacy of this instruction as applied in the present case.

[12]Luparello additionally argued since either the conspiracy or aiding and abetting theories were inaccurately applied and the particular theory on which the jury relied could not be determined, he was entitled to a reversal of his murder conviction. (*People* v. *Green, supra,* 27 Cal.3d at p. 69.) However, as we have determined, both theories were appropriately applied to the present facts, and hence Luparello's argument must fail.

## VII

### Cruel or Unusual Punishment

In his reply brief, Luparello argues for the first time his sentence constituted cruel or unusual punishment under article I, section 17, of the California Constitution. Primarily relying on *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], he argues his sentence was disproportionate when considering his individual culpability for the crimes. We disagree.

In *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921], our Supreme Court explicitly held a statutory punishment may be cruel or unusual, and hence violative of the state constitution, if it is grossly disproportionate to the offense for which it is imposed. (*Id.* at p. 424.) The United States Supreme Court reaffirmed a proportionality standard under the Federal Constitution in *Enmund* v. *Florida* (1982) 458 U.S. 782, 788 [73 L.Ed.2d 1140, 1146, 102 S.Ct. 3368]. After acknowledging the Legislature's function in defining crimes and prescribing punishments, the California Supreme Court in *Dillon* applied the reasoning of the above-cited cases to determine whether, given the circumstances of that case, a first degree murder punishment was "'. . . so disproportionate to the crime for which it [was] inflicted that it shock[ed] the conscience and offend[ed] fundamental notions of human dignity.'" (*People* v. *Dillon, supra,* 34 Cal.3d at p. 478, quoting *In re Lynch, supra,* 8 Cal.3d at p. 424.)

In *Dillon,* the defendant was a 17-year-old high school student who, along with six other schoolmates, planned a "rip-off" of marijuana growing in a mountain field. Several of the boys took guns with them to the field; the defendant carried a .22 caliber semi-automatic rifle. The group proceeded in their venture, and the defendant was stationed near the edge of the field. The defendant heard several shots and, believing his friends were being "blown away," became quite alarmed. Thereafter he was confronted by the victim who was carrying the shotgun. The defendant, according to his testimony, "'didn't know what to do'" and "'just pressed the trigger, I was so scared. . . . I just kept squeezing it, and shots just went off.'" (*People* v. *Dillon, supra,* 34 Cal.3d at p. 483.) The victim died several days later. The jury found the defendant guilty as charged. However, they expressed reservation about the harshness of the felony-murder rule and queried whether they could return a second degree murder verdict even though the killing occurred during the attempted robbery. After explicating the salient aspects in the nature of the offense and the offender vis-à-vis proportionate punishment (*id.* at p. 479), the Supreme Court found the defendant's life imprisonment sentence unconstitutionally excessive and modified the

conviction to second degree murder (*id.* at p. 489). In reaching its conclusion, the Supreme Court was persuaded by the reluctance of the jury to apply the felony-murder rule to the facts of the case, the defendant's immaturity and inability to foresee the risk of harm he was creating, the absence of any other criminal activity in the defendant's background, and the comparatively "petty chastisements" which were meted out to the other youths who participated in the same offenses. (*Id.* at pp. 487-488; see *People v. Laboa* (1984) 158 Cal.App.3d 115, 121 [204 Cal.Rptr. 181].)

While Luparello finds parallels between his circumstances and those of *Dillon,* we do not. Luparello was not an impetuous adolescent, but a learned and professional man in his mid-30's. Also, his charge arises as a consequence of a conspiracy he orchestrated, not as an application of the felony-murder rule. At all times, Luparello was the prime mover in the conspiracy. He coordinated meetings, gave directions, targeted the victim and paid for his coconspirators' assistance. Indeed, there is no question Luparello masterminded and encouraged the criminal cabal which ultimately resulted in the victim's death. Further, Luparello fails to identify any instance where the sentencing court did other than carefully and individually consider his sentence. We note the probation report did outline Luparello's otherwise nonviolent background, his exemplary behavior during incarceration and his apparent lack of a prior criminal record. Moreover, Luparello was sentenced after the court had thoroughly considered Orduna's individual culpability and just punishment. In stating: "[I]t is my intention to sentence the defendant in this case to the same [sentence] as I sentenced the defendant Orduna, . . .", the sentencing court was implicitly finding Luparello as culpable as Orduna and thereby deserving of the same sentence. Thus, on this record we cannot say Luparello's individual culpability was ignored nor that his sentence constituted cruel or unusual punishment.

Having reviewed Luparello's contentions and finding no prejudicial error, we affirm.

ORDUNA'S APPEAL

VIII

PROSECUTORIAL MISCONDUCT, INSTRUCTIONAL ERROR AND CRIMINAL LIABILITY PREDICATED ON CONSPIRACY AND AIDING AND ABETTING THEORIES

Orduna reasserts Luparello's contentions regarding prosecutor misconduct, instructional error and improperly deriving criminal liability from conspiracy and aiding and abetting theories. We do not restate the arguments

here but similarly resolve them adversely to Orduna. Additionally, Orduna cites approximately 10 further instances of alleged misconduct in the pros9ecutor's colloquy. These are, however, bare allegations, stating neither the gravamen nor prejudice arising therefrom. After reviewing each of these allegations, we find no evidence of misconduct and also note Orduna failed to object to over half of these alleged wrongs. (*People* v. *Green, supra,* 27 Cal.3d at p. 34.) Further, Orduna argues the prosecutor, in effect, served as an unsworn witness by putting evidence of Orduna's alleged relationship with the F-Troop gang before the jury. In so doing, Orduna contends the prosecutor violated his Sixth Amendment right to confrontation. (*People* v. *Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396].) Yet, Orduna does not direct us to any particular incident in the record. The other misconduct allegations Orduna invites us to review show the trial court consistently safeguarded Orduna's Sixth Amendment rights by properly sustaining objections and admonishing the jury to limit the use of evidence to the purpose for which it was admitted. In effect, Orduna asks us to speculate about misconduct, and this we cannot do. He has the burden of proving such harm, and on this record has failed to sustain that burden.

## IX

### DENIAL OF THE MOTION TO SEVER

Orduna contends the trial court improperly denied his motion to sever and outlines five *Massie*[13] factors, all allegedly present in this case, which highlight the impropriety of the trial court's ruling. These factors include: "(1) Where there is an extrajudicial statement made by one defendant which incriminates another defendant and which cannot adequately be edited to excise the portions incriminating the latter (*People* v. *Aranda,* 63 Cal.2d 518, 530-531 [47 Cal.Rptr. 353, 407 P.2d 265]; see also *Bruton* v. *United States,* 391 U.S. 123) [20 L.Ed.2d 476, 88 S.Ct. 1620]; (2) where there may be prejudicial association with codefendants (*People* v. *Chambers,* 231 Cal.App.2d 23, 28-29) [41 Cal.Rptr. 551]; (3) where there may be likely confusion from evidence on multiple counts (*People* v. *Chambers, supra,* p. 34); (4) where there may be conflicting defenses (*Day* v. *State,* 196 Md. 384, 391 [76 A.2d 729]); and (5) where there is a possibility that in a separate trial the codefendant may give exonerating testimony. (*United States* v. *Echeles* (7th Cir. 1965) 352 F.2d 892, 898.)" (*People* v. *Isenor* (1971) 17 Cal.App.3d 324, 331 [94 Cal.Rptr. 746].) We review Orduna's argument on each of these factors.

 He first argues Luparello's extrajudicial statement, "[I have] some Mexicans that are going to take care of Mark Martin," is within the ambit

---

[13]*People* v. *Massie* (1967) 66 Cal.2d 899 [59 Cal.Rptr. 733, 428 P.2d 869].

of *People* v. *Aranda, supra,* 63 Cal.2d 518, and *Bruton* v. *United States, supra,* 391 U.S. 123, and its subsequent admission necessitated severance. As previously stated, the Supreme Court in *Aranda* called for severing a joint trial when the prosecution seeks to introduce an extrajudicial statement of one defendant that implicates a codefendant. (*People* v. *Aranda, supra,* at pp. 530-531.) Here, Luparello's statement does not expressly implicate Orduna and should therefore not fall under the *Aranda* directive. Even assuming the implication in Luparello's statement were explicit, the admission of the statement in the joint trial did not violate the principle of *Aranda*.

Our courts have long recognized extrajudicial statements within the co-conspirators' exception to the hearsay rule are not subject to the *Aranda-Bruton* rules. (*People* v. *Brawley* (1969) 1 Cal.3d 277, 286 [82 Cal.Rptr. 161, 461 P.2d 361].) Evidence Code section 1223 outlines this exception and provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) the statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; . . ." Luparello's statement was clearly made during the conspiracy and furthered the object of the conspiracy, that is, finding Terri and Ed Gadzinski, by attempting, through Hazel Schwulst's restatement of the threat, to badger and intimidate Mark Martin into revealing the Gadzinskis' whereabouts. Given this factual background, the statement was properly admitted.

Orduna, however, argues the plan to locate the Gadzinskis was *lawful* and therefore cannot be the object of the conspiracy. He further reasons Luparello's statement thus cannot be said to further the conspiracy's objective and cannot properly be admitted under Evidence Code section 1223. Orduna misapprehends the law. Under our Penal Code and specifically section 182, "[a] criminal conspiracy is an agreement between two or more persons that they will commit an unlawful object (or achieve a *lawful object* by unlawful means), and in furtherance of the agreement, have committed one overt act toward the achievement of their objective." (*People* v. *Fujita, supra,* 43 Cal.App.3d at p. 471, italics added.) Thus, the search for the Gadzinskis, though arguably lawful, may indeed be a conspiratorial objective and statements, such as Luparello's, made to further it can be excepted from the hearsay rule.

Orduna mistakenly relies on *People* v. *Williams* (1979) 97 Cal.App.3d 382 [158 Cal.Rptr. 778], to argue the conspiratorial objective must be the substantive crime the conspirators plan. In *Williams,* the defendants sought to apply the statute of limitations rule for determining the termination of a conspiracy to demur to an indictment. This rule, stated in *People* v. *Zamora*

(1976) 18 Cal.3d 538, 554 [134 Cal.Rptr. 784, 557 P.2d 75], holds a conspiracy terminates upon the completion of its primary object and technically that means the substantive offense which the conspirators agree to commit. Here we are faced with an entirely different issue, and this reasoning, while correct, is inapposite. Thus, we find Luparello's statement was properly admitted, and the admission did not necessitate severance.

For the first time on appeal, Orduna argues the joint trial prejudicially associated him with Luparello, resulted in a confusion of issues, and precluded Luparello from giving exonerating testimony. These arguments, however, are based on sheer speculation. Orduna makes no reference to the record or any offer of proof that would support his contentions. Without a factual basis, we find no merit in his arguments.

 Orduna also asserts severance was necessary to preclude conflict between his and Luparello's defenses. Orduna grounds this argument on the exclusion of certain statements made by Salmon which allegedly exonerated Orduna and implicated Luparello. However, the record shows these hearsay statements were presented in the testimony of Salmon's onetime cellmate. Without a more substantial conflict, severance of the joint trial was unwarranted.

Having found no substantial basis for severing the trials, we find the trial court's denial of the motion was proper.

## X

### JURY BIAS AND INSUFFICIENCY OF EVIDENCE

Orduna recasts the prosecutor's alleged misconduct as having somehow denied him of a fair and impartial jury. Having already determined the prosecutor's conduct has caused no harm, we find no greater merit in its reassertion in a different guise. In summarizing his argument on this point, Orduna stated: "Perhaps the argument can be advanced that absent more concrete proof [of] 'jury tampering' or showing that definite prejudicial statements were finally made to the jurors who decided the case, the issue of an impartial jury is not important." We concur with this assessment.

Orduna contends the evidence insufficiently supports his convictions for conspiracy and murder. On appeal, the test is whether substantial

evidence supports the conclusion of the trier of fact, and not whether the evidence proves the defendant's guilt beyond a reasonable doubt. (*People v. Reyes* (1974) 12 Cal.3d 486, 497 [116 Cal.Rptr. 217, 526 P.2d 225].) Reversal is not warranted merely because the facts of the case might be reconciled contrary to the judgment. (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) ▋ Here, Orduna met several times with Luparello, agreed to find Terri and Ed Gadzinski "at any cost," received money for his assistance, went while armed with a deadly weapon to Mark Martin's home, hid to avoid discovery while waiting to ambush Martin, returned to Martin's home on the day of the shooting, lured Martin within the shooter's range and was seen by Martin's mother fleeing the scene. Though other evidence may support other inferences, the facts outlined above substantially support the judgment.

## XI

### CRUEL OR UNUSUAL PUNISHMENT

Adopting the reasoning of Luparello's related assertion, Orduna contends his sentence, too, constituted cruel or unusual punishment. We find this contention patently without substance. After the jury determined Orduna should be penalized to life imprisonment without the possibility of parole, the sentencing court intervened to consider thoroughly Orduna's culpability and contributions to the crimes. After making detailed and thoughtful findings,[14] the sentencing court struck the special circumstance finding and sentenced Orduna to imprisonment for a term of 25 years to life. Thus, in contrast to Orduna's contention, the sentencing court did consider the circumstances of his crime and accordingly fashioned a just sentence. We find no cruel or unusual punishment on this record.

---

[14]Some of the factors considered were outlined in the minute order of the sentencing hearing:

"1. The interests of justice would be better served by life with parole in Carlos Orduna's case.

"2. That the public safety would not require a life sentence without parole.

"3. Defendant Orduna played a minor role in the crime.

"4. The Defendant, with no apparent predisposition to do so, was induced by others to participate in the crime.

"5. Lack of significant prior criminal conduct.

"6. That Orduna did not know and had no personal intent to kill the victim and was not personally violent in the homicide.

"7. That Orduna expressed remorse about the killing and was afraid to testify against the actual killer.

"8. Defendant's sister's testimony, his remarks to the doctors and his counsel's approach to defending the case brought more evidence to light which may well aid in the prosecution of the other perpetrators."

## Disposition

Judgments affirmed.

Kintner, J.,* concurred.

**WIENER, J.**—I concur in the majority opinion with the exception of sections V and VI in Luparello's appeal.[1] As to those issues, I concur in the result reached by the majority under the compulsion of *People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318] and *People* v. *Croy* (1985) 41 Cal.3d 1, 12, footnote 5 [221 Cal.Rptr. 592, 710 P.2d 392]. Those cases require a holding that an aider and abettor or coconspirator is liable not only for those crimes committed by a cofelon which he intended or agreed to facilitate but also for any additional crimes which are "reasonably foreseeable."[2] The majority, citing Professor Kadish's recent article,[3] recognize a doctrinal tension in extending accomplice and conspiratorial liability beyond intended acts but conclude, based on *Croy,* that this principle of extended criminal liability does not suffer from any "theoretical infirmit[y]." (Maj. opn., *ante,* p. 441.)

The fact that the Supreme Court has announced a principle of law certainly requires that as an intermediate appellate court we follow it. (See *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) This does not mean however, that the announced principle is either logically consistent or theoretically sound. On a prior occasion I expressed my concern with the legal principle at issue. My dissent in *People* v. *Martin* (1983) 150 Cal.App.3d 148, 170 [197 Cal.Rptr. 655], written before either *Beeman* or *Croy* was decided, failed to attract the attention of a majority of the Supreme Court. I will therefore not repeat

---

*Assigned by the Chairperson of the Judicial Council.

[1]Although Orduna makes the same arguments as Luparello, his position is largely undercut by the explicit jury finding that he *intentionally* killed Mark Martin while lying in wait. Thus his liability need not be based on the fact that Martin's death was a reasonably foreseeable consequence of the conspiracy to assault.

[2]Henceforth I refer to this principle as the "foreseeable consequence" doctrine because that is the terminology used in *Croy.* I am concerned, however, about how a principle which was originally phrased in terms of "probable and natural consequences" (see *People* v. *Kauffman* (1907) 152 Cal. 331, 334 [92 P. 861]) was slightly modified to become the "natural and reasonable consequences" (see *Beeman, supra,* 35 Cal.3d at p. 560) and has now been saddled with a moniker traditionally associated with theories of expanding tort liability. (See, e.g., *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 448, 539 P.2d 36].) If we were to return to strict interpretation of the "natural and probable" standard, I would argue that liability could not be imposed here on Luparello because it in no sense can be said that Mark Martin's death was the "probable" result of a conspiracy to assault him in order to obtain information.

[3]See Kadish, *Complicity, Cause and Blame: A Study in the Interpretation of Doctrine* (1985) 73 Cal.L.Rev. 323.

my discussion in *Martin,* which basically stated what I thought the law *should* be. Instead, I will briefly comment on what I perceive to be the serious incongruities created by the "foreseeable consequence" doctrine.

Professor Kadish argues that the theory underlying accomplice liability does not permit liability to attach to an accomplice or coconspirator for the acts of another unless the accomplice or coconspirator intended such acts. He explains that the "foreseeable consequence" doctrine "would seem to allow holding the accomplice for a crime of knowledge or purpose committed by the principal as long as he should have anticipated the principal's actions." (73 Cal.L.Rev. at p. 352.)

The major fallacy I see in the "foreseeable consequence" doctrine is not so much that it attributes an unintended *act* to the accomplice/coconspirator but rather that it assesses the degree of his culpability for that act not by his own mental state but rather by the mental state of the perpetrator and/ or the circumstances of the crime. The present case provides an appropriate example. The assault on Mark Martin contemplated by the conspiracy involved a foreseeable risk of death or serious injury. We can assume (although there was no jury finding on the issue) that Luparello was criminally negligent in failing to appreciate the degree of risk. Under usual circumstances, a person negligently causing the death of another is guilty, at most, of involuntary manslaughter. Here, however, Luparello's liability is not based on his individual mental state but instead turns on the jury's finding that the unidentified shooter intentionally killed Martin while lying in wait. Thus, Luparello is guilty of first degree murder. If the circumstances of Luparello's participation were exactly the same but the shooter did not "lie in wait," Luparello could only be convicted of second degree murder. I am intrigued by the notion that if unknown to Luparello, the shooter ingested drugs and/ or alcohol to the point where he did not in fact harbor the requisite malice, Luparello would presumably be guilty only of voluntary manslaughter. And to take it a step further, if it turned out the shooter was insane, would Luparello have no liability at all for Martin's homicide? As I explained in my *Martin* dissent, I find such fortuity of result irrational. So too, apparently, do Professors LaFave and Scott in their treatise on criminal law: "The 'natural and probable consequence' rule of accomplice liability, if viewed as a broad generalization, is inconsistent with more fundamental principles of our system of criminal law. It would permit liability to be predicated upon negligence even when the crime involved requires a different state of mind. Such is not possible as to one who has personally committed a crime, and should likewise not be the case as to those who have given aid or counsel." (LaFave & Scott, Handbook on Criminal Law (1972 ed.) p. 516.)

The drafters of the Model Penal Code reached a similar conclusion. Section 2.06(3)(a) establishes a standard for accomplice liability which, like California's governing *Beeman* standard, requires that the accomplice act "with the purpose of promoting or facilitating the commission of the offense, . . ." Missing from the Model Penal Code, however, is any reference to the "foreseeable consequence" doctrine. The Comment to the section addresses the issue as follows: "[The accomplice] must have the purpose to promote or facilitate the particular conduct that forms the basis for the charge, and thus he will not be liable for conduct that does not fall within this purpose. [¶] This does not mean, of course, that the precise means used in the commission of the crime must have been fixed or contemplated or, when they have been, that liability is limited to their employment. One who solicits an end, or aids or agrees to aid in its achievement, is an accomplice in whatever means may be employed, insofar as they constitute or commit an offense fairly envisaged in the purposes of the association. *But when a wholly different crime has been committed, thus involving conduct not within the conscious objectives of the accomplice, he is not liable for it . . . .*" (Model Pen. Code & Commentaries, com. 6(b) to § 2.06, pp. 310-311, italics added.) In support of this reasoning the drafters quoted from a conspiracy decision written by Judge Learned Hand: "At times it seemed to be supposed that, once some kind of criminal concert is established, all parties are liable for everything anyone of the original participants does, and even for what those do who join later. Nothing could be more untrue. Nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it; if later comers change that, he is not liable for the change; . . . ." (*United States* v. *Peoni* (2d Cir. 1938) 100 F.2d 401, 403.)

In contrast to the majority, which seeks to distinguish the "forseeable consequence" doctrine from the "disfavored" felony-murder rule (see maj. opn., *ante,* p. 437), I view both as being founded on the same outmoded and logically indefensible proposition that if a person exhibits some intent to violate the law, we need not be terribly concerned that the contemplated crime was far less serious than the crime which actually took place. Consider the following discussion in the Supreme Court's *Croy* decision: "It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is *criminal* was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. *It is the intent to encourage and bring about conduct that is criminal,* not the specific intent that is an element of the target offense, which *Beeman* holds must be found by the jury." (41 Cal.3d at p. 12, fn.

5, italics added.) Contrast it with the following description of the theoretical basis for the felony-murder rule in LaFave and Scott's treatise: "The rationale of the doctrine is that one who commits a felony is a bad person with a bad state of mind, and he has caused a bad result, so that we should not worry too much about the fact that the fatal result he accomplished was quite different and a good deal worse than the bad result he intended." (LaFave & Scott, *op. cit. supra,* at p. 560.)

In our means-oriented society, to have the end alone justify the punishment is unconscionable. The artificial imputation of stepped-up intent, inherent in both the felony-murder rule and the "foreseeable consequence" doctrine, is inconsistent with the "universal and persistent" notion that criminal punishment must be proportional to the defendant's culpable mental state. (See *Morissette* v. *United States* (1952) 342 U.S. 246, 250-251 [96 L.Ed. 288, 293-294, 72 S.Ct. 240].) Justice Mosk's dissent in *Taylor* v. *Superior Court* (1970) 3 Cal.3d 578, 593 [91 Cal.Rptr. 275, 477 P.2d 131] expressed it well: "Fundamental principles of criminal responsibility dictate that the defendant be subject to a greater penalty only when he has demonstrated a greater degree of culpability. To ignore that rule is at best to frustrate the deterrent purpose of punishment, and at worst to risk constitutional invalidation on the ground of invidious discrimination." The fact that the accomplice or coconspirator intended to facilitate some less serious criminal act does not render these fundamental principles inapplicable. As the United States Supreme Court has explained, "The constitutional necessity of proof beyond a reasonable doubt is not confined to those defendants who are morally blameless. E.g., *Mullaney* v. *Wilbur,* 421 U.S. at 697-698 (requirement of proof beyond a reasonable doubt is not 'limit[ed] to those facts which, if not proved, would wholly exonerate' the accused). Under our system of criminal justice even a thief is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglar." (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 323-324 [61 L.Ed.2d 560, 576-577, 99 S.Ct. 2781].)

By these references I do not mean to suggest that the "foreseeable consequence" doctrine is unconstitutional, although an argument can be made in that regard. (Cf. *People* v. *Dillon* (1983) 34 Cal.3d 441, 495-498 [194 Cal.Rptr. 390, 668 P.2d 697] (conc. opn. of Bird, C. J.).) Here, however, Luparello has been convicted of first degree murder under circumstances where, in the absence of the "foreseeable consequence" doctrine, he would be guilty at most of involuntary manslaughter. As to the felony-murder rule, the Supreme Court has concluded the rule is a creature of statute, codified by the Legislature in Penal Code section 189 and, as such, must be applied by the courts. (See *People* v. *Dillon, supra,* 34 Cal.3d at pp. 450, 472.) No similar impediment appears with respect to the "foreseeable consequence" doctrine. It is purely a creature of judicial interpretation subject

to the thoughtful evolution of the common law. As scholars and commentators have consistently concluded, the time for considered reevaluation is long overdue.

The petition of appellant Luparello for review by the Supreme Court was denied February 11, 1987.