Filed 7/6/15  P. v. Mendez CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B254376 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA399348) |
| v. | |
| JESUS MENDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Ronald H. Rose, Judge.  Affirmed.

Kim Malcheski, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Tasha G. Timbadia, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found defendant Jesus Mendez guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] (count 1) and second degree robbery (§ 211) (count 2). In both counts, the jury found defendant personally and intentionally used and discharged a firearm causing death within the meaning of section 12022.53, subdivisions (b), (c), and (d). The jury found defendant committed the murder while engaged in the commission of the robbery within the meaning of section 190.2, subdivision (a)(17).

The trial court imposed a sentence of life without the possibility of parole for the murder with the special allegation. The court sentenced defendant to the upper term of five years for the robbery and stayed the sentence under section 654. The court imposed a consecutive sentence of 25 years to life for the firearm enhancement in both counts under section 12022.53, subdivision (d) and stayed the enhancement in count 2. The court stayed the remaining firearm enhancements.

Defendant appeals on the grounds that: (1) The trial court committed reversible federal constitutional error under the Fifth and Fourteenth Amendments by permitting the prosecutor to elicit highly prejudicial testimony about his alleged gang membership and tattoos; and (2) Defense counsel was ineffective under the Sixth and Fourteenth Amendments for failing to object to the highly prejudicial testimony regarding gangs.

## FACTS

**Prosecution Evidence**

On the morning of April 19, 2012, police officers responding to a call found the body of Jamie Abuawad outside his SUV parked on West 81st Street in Los Angeles. Abuawad died of multiple gunshot wounds. Abuawad was in the business of buying gold. He employed two women to pass out his business cards on the street and house to house in various Los Angeles neighborhoods. Abuawad would respond to telephone calls from potential sellers of gold by immediately driving to meet them. He would pay cash for the gold he bought.

---

[1]     All further references to statutes are to the Penal Code unless stated otherwise.

A resident of West 81st Street testified at trial that he noticed a young man sitting on a wall outside his residence at approximately 11:00 a.m. on the day of the shooting. The resident removed his trash cans from the street and went back inside his home. Later, he looked outside and saw the young man talking on the phone. The resident went back inside and shortly thereafter heard two or three gunshots in rapid succession. He went outside and saw Abuawad lying on the ground. The resident described the young man he had seen on the wall as being dark-skinned, slender, and having a tattoo on his right cheek. He identified defendant as this man in a photographic lineup and at trial.

One of Abuawad's employees testified that she and her coworker often distributed cards in the neighborhood of West 81st Street where Abuawad was shot. Detectives showed her a photographic lineup, and she selected defendant's picture as someone she recognized. She remembered seeing defendant on West 82nd Street, almost in the location where the shooting occurred. She saw her coworker give him a business card and speak with him.

Investigating detectives arrived at the shooting scene to find the SUV's motor running. The driver's side and passenger side doors were open. Officers had found two cell phones nearby in an alley. One was the victim's and the other was found to belong to an individual who had lost his cell phone some days before. The individual was handicapped and had mental challenges. His phone had been used to call Abuawad four times. Police looked at the other numbers called on the cell phone and traced some calls to a young girl who was the sister of defendant's girlfriend. She showed police some pictures on another phone in her possession. One of the photographs was of defendant. She identified defendant, who lived on West 80th Street, to police.

Defendant was brought to the police station for an interview. Detectives spoke to defendant and then left him alone for a time. Defendant subsequently asked to speak to the detectives. This interview was recorded and played at trial. Defendant told the detectives, "I did it." He said it was a robbery gone bad. He had telephoned Abuawad and "set him up." Defendant had been laid off and wanted the money. He robbed Abuawad at gunpoint, and Abuawad tried to grab the gun, so defendant started shooting.

3

He shot three times and made off with $300 and the victim's phone. Defendant said he sold the gun. He told the detectives, "I knew you guys had me," and it was "just a matter of time." He said, "It just don't feel good inside afterwards since he had a family. It's not the same."

Detective John Ferreria testified that he and his partner, Detective Myra Kellum, had previously presented defendant with the theme or scenario about a robbery gone bad and defendant's need for money. They had decided beforehand to say this as an interview strategy. Detective Ferreria had defendant turn over his shoes at the interview to compare them to a shoeprint found on the discarded cell phone in the alley. The pattern was a match according to Detective Ferreria's lay opinion.

Afterwards, Detective Ferreria placed defendant in a cell with an informant in order to make sure that defendant's statements were truthful. Their conversation was recorded and played for the jury. The informant, called Mr. Johnson, asked defendant where he was from. Defendant's reply was inaudible, but Johnson replied, "F13's?" Defendant then asked Johnson where he was from, and Johnson replied, "Six Deuce Brims." When asked what he had done, defendant said "basically, I pled guilty for this shit." When asked if he was by himself, defendant said he was. He said he used a .380-caliber gun. He told Johnson the detectives brought his "baby mama" in, and she was crying. She said, "They told me they were going to take the kids away." When asked if the police had him for robbery-murder or just murder, defendant said he did not know. Defendant said he hoped to get a deal. He was "just doing that shit to feed [his] children." He hoped to get out when he was "like 45." When asked how he felt about what happened, he replied that he "just didn't think about it."

Detective Ferreria testified that he never told defendant or anyone in his family that he was going to take defendant's children. Also, defendant never told the detectives he was concerned they would take his kids. The detective, in response to the prosecutor's questions, explained terminology from the recorded conversation in the cell as well as certain aspects of gang culture.

**Defense Evidence**

Defendant offered no evidence in his behalf.

## DISCUSSION

## I.  Admission of Testimony Regarding Gangs

### A.  *Defendant's Argument*

Defendant contends the trial court abused its discretion and committed reversible federal constitutional error under the Fourteenth Amendment by admitting highly prejudicial testimony about the Florencia gang and defendant's "Crip Killer" tattoo.  Both were irrelevant to the charges against him.

### B.  *Relevant Authority*

Relevant evidence is evidence "including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  The trial court has wide discretion in determining the relevancy of evidence. (*People v. Garceau* (1993) 6 Cal.4th 140, 177.)

Evidence pertaining to gangs and gang membership may be relevant to a number of issues in a criminal trial (*People v. Harris* (1985) 175 Cal.App.3d 944, 957), as well as to credibility (*People v. Ayala* (2000) 23 Cal.4th 225, 276-277).  When such evidence meets the test of relevancy, it is admissible unless the probative value of the evidence clearly is outweighed by its prejudicial effect.  (Evid. Code, § 352; *People v. Williams* (1997) 16 Cal.4th 153, 193; *People v. Cardenas* (1982) 31 Cal.3d 897, 904-905 (*Cardenas*).)  Evidence of a defendant's gang membership generally creates a risk that the jury will improperly infer that the defendant has criminal propensities, acted in accordance with such propensities, and is therefore guilty of the charged offense. (*Williams*, at p. 193.)  The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason.  (*People v. Williams* (2008) 43 Cal.4th 584, 634-635; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1519.)  Appellate courts rarely find an abuse of discretion

under Evidence Code section 352. (*People v. Ramos* (1982) 30 Cal.3d 553, 598, fn. 22, reversed on other grounds in *California v. Ramos* (1983) 463 U.S. 992, 997.)

Evidence Code section 1101, subdivision (a) may prohibit the admission of gang evidence if it includes specific instances of a person's conduct '"to prove his or her conduct on a specified occasion."' (*People v. Lindberg* (2008) 45 Cal.4th 1, 22.) Evidence Code section 1101, subdivision (c), however, provides that "[n]othing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness." To be admissible, the evidence '""must not contravene other policies limiting admission, such as those contained in Evidence Code section 352."""' (*People v. Harrison* (2005) 35 Cal.4th 208, 229.)

### C. Proceedings Below

Prior to the conclusion of Detective Ferreria's testimony and the playing of the recording of defendant's conversation with the jailhouse informant, an Evidence Code section 402 hearing was held. The trial court told defense counsel he could object if the prosecutor failed to lay a foundation for the recording. Defense counsel also objected on confrontation clause grounds. The trial court found the audio-visual recording admissible, since the circumstances of its recording were no different than having the detective inside the cell when it occurred. The defense could fully cross-examine the detective.

Upon retaking the stand, Detective Ferreria explained that the detectives placed defendant in the cell "[t]o gather more information and to test his statements to us during our interview." Detective Ferreria wished to verify if anyone else was involved in the robbery and murder and, if so, his or her identity. He then explained that the recording was done as he watched and listened. Defense counsel had no objections to the transcript that was distributed to the jury, and the recording was played in its entirety.

After the viewing of the DVD, the prosecutor asked Detective Ferreria if he recalled Johnson asking defendant, "you fittin' to throw down with me?," and the defendant asking what was wrong with the building. The prosecutor elicited that Johnson was a "male Black," and suspects of African-American descent and Hispanics are not

6

generally housed together. Defendant was expressing his concern about being in a cell with Johnson. The prosecutor then noted a remark Johnson made about "F13" and asked whether the detective had heard of that and how. Detective Ferreria responded that he had previously "worked gangs," and F13 meant Florencia 13, a Hispanic gang. Defense counsel objected, and the trial court sustained the objection but called for a sidebar conference. Defense counsel told the court that, in addition to the fact that Detective Ferreria was not a gang expert, he was discussing gangs, which was completely and grossly prejudicial to defendant.

When asked to state the relevance of the testimony, the prosecutor replied that she wanted to reveal defendant's lack of remorse in the conversation with Johnson. She anticipated the defense would try to claim defendant showed remorse when he spoke with the two detectives. The court stated it was inclined to allow the testimony only to show defendant's state of mind at the time he was speaking. Defense counsel asserted that the jury should be informed that was the sole purpose of the testimony.

Before further testimony, the court told the jury, "Any testimony in regards to any gang activity is admitted to show only the defendant's state of mind at the time that he is making this statement in the jail. It is not to be considered for any other purpose." The court overruled the prior objection.

The prosecutor then elicited that Detective Ferreria had previously testified as a gang expert. He explained that the Florencia 13 gang is a predominantly Hispanic gang, and the 6 Deuce Brims gang, claimed by Johnson in the recording, is a predominantly Black gang. The two gangs were "neither friend nor foe." The Florencia 13 gang's rival is the East Coast Crips. The prosecutor elicited the detective's opinion that the "CK" tattoo on defendant's face stands for "Crip Killer." The trial court overruled defense counsel's relevance objection, stating, "It is limited to that same purpose, only to show the defendant's state of mind at the time of the making of any statements."

After several questions unrelated to gangs, the prosecutor asked Detective Ferreria if he knew what a burner was. He said it was a gun, and he had heard the term when talking with gang members. After several more questions, the prosecutor asked the

7

detective if he had an opinion as to what the "18's" were, which were referred to by Johnson as being in the cells that day. The detective stated it meant the 18th Street gang or a member of that gang. The prosecutor asked if Florencia 13 and the 18's were friendly or not, and the court overruled the defense relevance objection. The court denied the defense request to approach. Detective Ferreria said the two gangs were currently enemies and were enemies in June 2012, when defendant was arrested. Defense counsel chose not to cross-examine Detective Ferreria, and the People rested.

Upon reading the jury instructions, the trial court gave the following instruction: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." The court also told the jury, "You may consider evidence of gang activity only for the limited purpose of deciding if [*sic*] the defendant's state of mind at the time he made those statements in the jail. You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit a crime."

During closing argument, the prosecutor stated, "[W]e also learn through the detective that there are politics that go on when it comes to being in custody . . . . And when this defendant is placed in the cell with the informant, immediately he's on edge. . . . This defendant, as you know, is a gang member and he's in a cell with another gang member of African-American gang. All right. That is an issue. Now, you heard about this defendant's gang affiliation. You don't convict him because he's a gang member. You obviously convict him because of the evidence in this case and the crimes he committed, but you learn about what's happening because it puts what this defendant told the detectives in context and in tone. . . . [Y]ou start to see his true personality. There's none of that, oh, remorsefulness, oh, this just happened, woe is me, you know, this is this robbery gone bad. That's not what you hear. You hear what this defendant tells this informant, which is, in no uncertain terms, I'm fucked . . . . And he goes on to further say, well, yeah, . . . fuck it, though. It is what it is."

8

### D. No Prejudicial Error

Defendant does not argue against admission of the recording of his conversation with Johnson in the jail cell, but only Detective Ferreria's testimony elicited by the prosecutor after the recording was played for the jury. Defendant specifically objects to the detective's statements that he had investigated homicides involving the Florencia 13 gang and the meaning of the CK tattoo on defendant's cheek. Defendant maintains that the gang-related testimony was not relevant, it created a substantial danger of undue prejudice and misleading of the jury, and it was inadmissible bad-character evidence and other-crimes evidence under Evidence Code section 1101, subdivisions (a) and (b). Furthermore, the testimony constituted a violation of his right to a fair trial under the Fourteenth Amendment. The court's limiting instruction was flawed and did not cure the prejudice.

The only issue in this case was whether defendant was guilty of first or second degree murder. The prosecutor argued defendant intended to shoot Abuawad so as not to leave any witnesses. The defense argued there was no evidence he planned to kill the victim, and it was a robbery gone wrong, just as defendant said. There were essentially two ways the defense could obtain the desired second degree murder verdict: by proving that defendant did not premeditate and deliberate the murder, or by an exercise of leniency on the part of the jury. (See *People v. Lewis* (2001) 25 Cal.4th 610, 656 [verdicts reached on basis of lenity, compromise, or mistake are not invalid].) In addition to arguing that there was no evidence that defendant planned to kill the victim, counsel argued that defendant was remorseful and quoted Detective Kellum's words praising defendant for having a conscience and feeling bad about the crime. He began argument by noting that defendant had lost his job, had small children whom he could not feed, and was in the country illegally and unable to obtain social services. As a result, he "made the worst mistake of his life." Counsel asked the jurors not to be passionate and angry and to find it was a case of second degree murder.

The prosecutor clearly anticipated this strategy and, for this reason, was relying on defendant's conversation with Johnson to reveal a lack of remorse on defendant's part.

9

Remorse is not a defense, as defendant points out, but it can send a message to the jury that elicits sympathy on the part of some of them. In this case, defendant's attitude toward his crimes is ultimately a credibility issue—an issue to which gang evidence is recognized as relevant. (*People v. Ayala*, *supra*, 23 Cal.4th at p. 277.) We note that defendant insists that the trial court erred in finding the evidence relevant based on defendant's state of mind during the conversation, arguing that the only state of mind that was relevant was the state of mind defendant had when committing the crimes. Clearly, the trial court was not referring to the mens rea element of the crimes defendant committed but rather his "state of mind" in the ordinary sense of the words, i.e., what he really thought about the crimes he committed and his confession, as revealed by his conversation with Johnson.

Furthermore, the prosecutor did not seek to elicit the detective's statement about having investigated F13 murder cases—this fact was blurted out as part of the detective's recitations of his qualifications to testify about gangs. Defense counsel had objected not only about the mention of gangs but also about the fact that the detective "is not a gang expert to start with." When permitted to continue with her direct examination of Detective Ferreria, the prosecutor asked the detective the basis of his knowledge, and he replied it was from "[h]aving worked gangs in '99 to 2003 dealing with Hispanic gangs and then when I was assigned to criminal gang homicide division, I've had homicides dealing with Florencia 13. And I've worked at criminal gang homicide division from 2008 again until my retirement in 2013." The remark about murders was thus buried in the detective's recitations of his qualifications to testify as an expert. He did not "go out of his way to mention several homicides" involving Florencia 13, as defendant asserts.

Moreover, we do not believe the detective's remarks constituted a violation of Evidence Code section 1101, subdivision (a), as defendant claims. The remark about having investigated murders involving F13 was made in the context of the detective's experience, and no specific crimes were mentioned. The explanation of the letters "CK" tattooed on defendant's face was by way of explanation of Johnson's attempts to calm defendant down so that defendant would talk to him. Johnson repeatedly says defendant

10

should not "be tripping" because Johnson was not "tripping" on defendant. Johnson explained he was more concerned about his problems as a three-striker and said, "I see the CK and all that shit. I ain't with all that shit, man. I'm a Brim. I'm a Blood. A bang Blood. Ain't got nothing to do with whatever. I understand what goes on with us and you-all. But up in here, we men. You know what I mean?" Johnson's remarks were meaningless without an explanation that "CK" meant Crip Killer, and that Johnson was not affected by that tattoo, since he was a Blood, and hence not defendant's enemy. The detective's explanation of the meaning of "CK" did not constitute other-crimes evidence or bad-character evidence in violation of Evidence Code section 1101, subdivision (a). Detective Ferreria had nothing more to say about defendant's tattoo after stating what, in his opinion, it meant. He at no time insinuated that defendant's tattoo implied he had a disposition to commit the instant crime, and the prosecutor's questioning moved away from gang relationships at that point.

With respect to the prosecutor's argument, she never suggested the robbery was a gang operation. Her only mention of defendant's gang affiliation during closing argument was to reiterate the circumstance that Johnson was not the type of person one would expect to be defendant's confidante. The prosecutor specifically stated to the jury, "You don't convict him because he's a gang member. You obviously convict him because of the evidence in this case and the crimes he committed." The prosecutor added, "[y]ou learn about what's happening because it puts what this defendant told the detectives in context and in tone. . . . [Y]ou start to see his true personality." Unlike defendant, we do not believe that by the words "true personality" the prosecutor meant defendant's disposition for committing the instant crimes, but rather his apparent callousness and self-absorption. Contrary to what he told the officers, defendant was more concerned about getting a deal by confessing up front than about his victim's family. Furthermore, the trial court twice instructed the jury that the sole purpose for the gang evidence was to evaluate defendant's state of mind.

In any event, we conclude defendant was not unduly prejudiced by the testimony to which he objects. "Evidence is not 'unduly prejudicial' under the Evidence Code

11

merely because it strongly implicates a defendant and casts him or her in a bad light . . . . Instead, undue prejudice is that which 'uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues.' [Citations.]" (*People v. Robinson* (2005) 37 Cal.4th 592, 632, fn. omitted.) Defendant did not dispute that he shot Abuawad. He admitted his crimes in two recordings played for the jury. Defendant's planning of the robbery, his taking of a loaded gun to confront Abuawad, and his leaving him for dead while taking with him incriminating evidence sufficiently revealed defendant's willingness to commit violent acts. The two points defendant most disputes were tangential to the bulk of the detective's testimony and to the recording of his interaction with Johnson. (See *People v. Luparello* (1986) 187 Cal.App.3d 410, 426-427 (*Luparello*) [finding a lack of prejudice despite prosecutor's misconduct in a nongang case by eliciting testimony about the violent activities of the appellant's gang].) As in *Luparello*, considering the circumstances of defendant's crimes, "evidence connecting [defendant] to a violent street gang— although hardly desirable from [defendant's] point of view— did not have the impact it might otherwise have had." (*Ibid*.)

The cases defendant relies upon are distinguishable. In *Cardenas*, *supra*, 31 Cal.3d 897, the issue was whether the appellant committed the crime, and the testimony was "sharply conflicting." (*Id*. at p. 901.) The identification testimony contained many discrepancies, and the appellant had an alibi. (*Id*. at pp. 902–903.) The prosecutor attacked the credibility of defense witnesses by eliciting testimony that the appellant and they were all members of the El Monte Flores gang. (*Id*. at p. 903.) The *Cardenas* court held that the trial court abused its discretion by allowing the introduction of the appellant's gang affiliation. (*Id*. at p. 904.) The court found that the evidence was cumulative and of minimal probative value in that it was offered only to establish the witnesses' bias, when other evidence already showed the witnesses were the appellant's friends and fellow boys club members. (*Ibid*.) On the other hand, there was a substantial danger of undue prejudice in the form of the jury inferring the appellant had a criminal disposition because the gang committed crimes and he was a member. (*Id*. at p. 905.)

12

In the instant case, unlike in *Cardenas*, the evidence of which defendant complains was not cumulative to any other evidence. Furthermore, defendant admitted to his crimes, and the only issue was whether the murder was of the first or second degree. As we have stated, there was no substantial danger of undue prejudice from Detective Ferreria's brief remarks. One was a passing reference to having investigated homicides that involved F13 by way of establishing his credentials as a gang expert. The reference to the meaning of the CK tattoo was not prejudicial, since it was established that defendant had used violence to achieve an end. The testimony did not insinuate the robbery and murder were a gang operation.

*People v. Maestas* (1993) 20 Cal.App.4th 1482, relied upon by defendant, could not be more distinguishable from defendant's case. In that case, the court found the erroneous admission of gang evidence was prejudicial because the evidence of guilt was weak and the "gang-violence-fear-retribution testimony and argument was pervasive." (*Id*. at p. 1498.) The case was a "'whodunit'" and only the victim's extremely flawed identifications pointed to the defendants. (*Id*. at pp. 1498, 1499.) The alibi defense was "strong and unrebutted," and the prosecutor "had no coherent theory of guilt." (*Id*. at p. 1499.) There was gang-expert testimony comprising 47 pages of the reporter's transcript. (*Id*. at p. 1500.) *Maestas* does not aid defendant's case.

In *Luparello*, the court stated that the prosecutor in that case used a witness's innocuous description of headgear worn by one of the perpetrators (who said it was "'like the F-Troopers . . . wear'") in order to pose a barrage of leading questions to a police officer regarding the officer's experience with the F-Troop gang. (*Luparello*, *supra*, 187 Cal.App.3d at pp. 423–426.) According to the *Luparello* court, the prosecutor "attempted to inform the jury by innuendo not only that F-Troop was a street gang whose members were suspected of committing homicides and other violent attacks on persons, but also that the gang was likely connected to the case in such a way that its members had threatened a material witness." (*Id*. at p. 426.)

The evidence provided in the instant case bears no comparison to the evidence embedded in the prosecutor's leading questions in *Luparello*, to which the officer merely

13

replied, "Yes, sir." Here, Detective Ferreria's brief mention of having investigated murders committed by the F13's among other crimes and his opinion on the meaning of defendant's tattoo did not seek to inform the jury by innuendo that the gang was connected to Abuawad's murder or that defendant's membership in a violent gang indicated he was disposed to violence. As noted previously, the *Luparello* court held that the prosecutor's apparent misconduct was nonprejudicial because the evidence of the preparation for the crimes showed the appellant's willingness to use weapons and commit acts of violence. (*Luparello*, *supra*, 187 Cal.App.3d at p. 426.) The *Luparello* court also cited the trial court's cautionary instruction, which, although different from the limiting instruction in the instant case, was one of the circumstances showing that it was not reasonably probable the jury would have reached a more favorable verdict in the absence of the misconduct. (*Id*. at p. 427.)

Having found defendant did not suffer undue prejudice from Detective Ferreria's brief testimony about defendant's tattoo and his experience with the F13 gang, we necessarily conclude defendant suffered no violation of his right to due process and a fair trial under the Fourteenth Amendment. Due process is violated only if there are no permissible inferences the jury may draw from the evidence. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.) Here, the admission of gang evidence was relevant to the principal issue in this case and was not unduly prejudicial. We also conclude defendant's trial counsel was not ineffective for failing to object on every possible legal ground defendant raises on appeal. (See *Strickland v. Washington* (1984) 466 U.S. 668, 697 [A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."].)

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.